**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alfred DILLARD and Marco Garza,**
**Defendants–Appellants.**

**Nos. 93–1946, 93–2419.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1994.

Decided Dec. 20, 1994.

Barry Rand Elden, Asst. U.S. Atty., Juanita S. Temple (argued), Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

Martin S. Agran, argued, Agran & Agran, Chicago, IL, for Alfred Dillard.

Joshua Sachs (argued), Chicago, IL, for Marco Garza.

Before ALARCON,* COFFEY and FLAUM, Circuit Judges.

COFFEY, *Circuit Judge.*

A federal grand jury returned a fourteen-count indictment charging Alfred Dillard, Marco Garza and six others with conspiracy to defraud federally insured financial institutions, bank fraud, possession of stolen mail and forgery of United States treasury checks

* The Honorable Arthur L. Alarcon, of the Ninth Circuit, is sitting by designation.

in violation of 18 U.S.C. §§ 371, 510, 1344, and 1708. Dillard entered a plea of guilty to the conspiracy count in exchange for the dismissal of all remaining counts. He was sentenced to 37 months of imprisonment to be followed by three years of supervised release, and ordered to pay $624.90 in restitution. Garza elected to go to trial, and was convicted by a jury of the conspiracy count, three counts of bank fraud and one count of possession of stolen mail and sentenced to 46 months of imprisonment to be followed by five years of supervised release. The district court also ordered him to pay $6,000 in restitution and a fine of $1,840.

On appeal, each of the defendants challenges his respective three-level enhancement for his role as a manager or supervisor under U.S.S.G. § 3B1.1(b). Dillard also challenges the district court's denial of a two-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1(a). Garza challenges the district court's calculation of the amount of loss attributable to him under U.S.S.G. § 1B1.3(a)(1)(B) and the enhancement for obstruction of justice under U.S.S.G. § 3C1.1. In addition, Garza argues that the district court abused its discretion in imposing a sentence disparate to that of his co-defendant and in limiting his cross-examination of a government witness. We affirm.

## I. Background

Alfred Dillard, Marco Garza and six others were charged with conspiracy to steal United States treasury checks and negotiate them with forged endorsements. In furtherance of the conspiracy, bank accounts were opened at several federally insured financial institutions in the Chicago, Illinois area. Almost all of the stolen checks were supplied by Augusta Green of Houston, Texas and forwarded to Robin Stokes, a resident of Chicago, Illinois. The checks were placed into either new or pre-existing accounts in Chicago banks by forged endorsement, and money was withdrawn from the accounts before the depository bank became aware of the fraud.

The group commenced its operation in December of 1989 when Augusta Green, a friend of Stokes, sent Stokes a stolen United States treasury check for $1.2 million. Stokes contacted defendant Alfred Dillard for assistance in cashing the check. According to Stokes, he felt that Dillard was the "right" person to perform this function for Dillard had experience in dealing with stolen checks.[1] Dillard invited Stokes to his office to discuss the matter. While Stokes was there, Dillard consulted with his "banker" in private regarding the negotiability of the stolen treasury check. After the meeting, he informed Stokes that the "banker" refused to handle the check because it was too large and thus, too risky. Dillard advised Stokes to hold the check for a couple of days. The check was ultimately returned to Green after Dillard failed in his attempt to find someone to cash it. Aside from Dillard, Stokes also displayed the $1.2 million check to defendant Marco Garza, and informed him of his inability to negotiate the check. Garza suggested to Stokes that Stokes "look out for him" in the future should Stokes obtain other stolen checks.

In January 1990, Augusta Green sent Stokes two more stolen treasury checks in amounts of $58,661.64 and $25,574.86. Stokes again contacted Dillard, and another meeting was held at Dillard's office at which time Stokes displayed one of the checks. Also in attendance was the co-defendant, William Holloway, whom Dillard had recruited to cash the stolen checks. Holloway in turn brought in co-defendant Tecia Green. Stokes subsequently gave Dillard the second check. The checks were fraudulently endorsed by Holloway and Tecia Green, and deposited in an account the two had opened in the name of "Ken–Cor Investments" at the Metropolitan Bank and Trust Company of Chicago, Illinois. For his help, Dillard received one third of the proceeds while Holloway and Tecia Green together shared a third. The remaining third went to Stokes and Augusta Green.

---

1. At this time, Dillard was on probation for a conviction of forging a stolen treasury check and converting it to his own use.

Stokes subsequently gave Holloway another stolen check in the amount of $41,635.83 without going through Dillard, although many of the checks Holloway and Tecia Green made out to cash against the "Ken–Cor Investments" account were typed by Dillard's secretary. At least one check was written to "George Dillard," an Alfred Dillard alias. In March of 1990, Stokes gave Dillard another stolen check in the amount of $30,638.89. The check was deposited in an account opened under the name of "Fidelity Financial Investments" at Riverdale Bank in Riverdale, Illinois by a "George Calderone."[2] Dillard received a portion of the proceeds from this account, although the exact amount was unclear.

In April 1990, Augusta Green mailed Stokes check number 5 in the amount of $76,924.91 in the series of stolen checks and Stokes turned it over to Holloway. Holloway opened an account at the Riverdale Bank in the name of "Korbie International, Inc." and deposited the check. Most of the checks deposited in this account were payable to defendant Marco Garza and endorsed with his alias "Robert William." Garza received $10,000 for his services.[3]

Between March and July 1990, Stokes received four more stolen treasury checks from Augusta Green totaling $218,101.13. He opened an account and deposited the checks at the Beverly Bank in Chicago. Two of the checks were endorsed by Garza. By late August, Stokes received another two checks totalling $94,008.10 from Augusta Green, and at the same time recruited his cousin, co-defendant Dennis Wilson, to participate in the check cashing scheme. Thereafter, Stokes and Wilson opened two more accounts and deposited the checks. Although Stokes absconded to Atlanta, Georgia before the checks were actually deposited, before leaving he asked Garza to "keep in contact" with Wilson to "make sure that everything was going fine." Stokes instructed Garza to hold one of the checks until Garza made sure that Wilson could deposit the first check and withdraw the money as instructed. Pursuant to Stokes's instruction, Garza withdrew the money and forwarded it to Stokes in Georgia.[4] Wilson did not know Stokes's whereabouts. Around the same time that Wilson deposited the second check, Garza gave Wilson at least two more stolen checks totaling $16,000 for Wilson to deposit.

By November 1990 Wilson, Hall and Holloway were under arrest. Stokes asked Garza if he knew someone who could open an account to deposit a $91,541.64 stolen treasury check supplied by Green. Garza asked his girlfriend, co-defendant Lori Jones, to perform this task. To assist Jones, Garza obtained a birth certificate and a driver's license under the name of "Cynthia Blake."[5] The bank refused to deposit Jones' check for the check was made out to a corporation. Garza and Jones then travelled to Springfield, Illinois, the state capital, filed the necessary documents with the Secretary of State Business Services and set up a phoney corporation. Thereafter, they opened a bank account under the corporate name at the Hyde Park Bank in Chicago, Illinois and deposited the $91,541.64 check. Jones then executed several transactions on the account at the direction of Stokes and Garza. Garza and Jones were arrested later while attempting to cash a check Jones made out to Garza.

At trial, Garza denied ever seeing the $1.2 million check, denied endorsing checks under an assumed name, and further denied giving any checks to Wilson or receiving more than $20 from Stokes. He stated that he did not know why Wilson contacted him regarding Stokes's whereabouts, and also denied travel-

---

2. The government contends that the "George Calderone" account was opened at the direction of Dillard and thus also involved in the check cashing conspiracy. The government further contends that John Hall in furtherance of the conspiracy opened the "George Calderone" account but was acquitted at trial.

3. The Korbie International account was the basis of two bank fraud counts of the indictment. Garza was acquitted of both counts.

4. These transactions with Wilson formed the basis for two counts of the indictment. Garza was acquitted of both of these counts.

5. Cynthia Blake was Stokes's former girlfriend from whom Stokes had stolen identification cards.

ling with Jones to Springfield, Illinois to set up a phoney corporation or having any knowledge of Jones's use of an assumed name. He claimed that his sole role was to transport Jones to various banks while she allegedly was transacting business for herself or Stokes. He further stated that he never received any instructions from Stokes when Stokes was in Georgia.

At trial, Garza sought to cross-examine Wilson regarding a polygraph examination Wilson had taken. Although Wilson had passed the polygraph examination, he gave a number of untruthful answers during the test which, according to Garza, went directly to the question of Wilson's credibility and should have been made known to the jury. The government argued that if the polygraph questions and answers were to be explored at trial, then the context and result of the polygraph examination must also be brought to the jury's attention. The district court found that the probative value of this polygraph evidence was outweighed by its prejudicial effect, and excluded the proposed cross-examination on this matter.

During Garza's sentencing hearing, the district court ruled that the amount of loss attributable to Garza was between $500,000 and $800,000. The court increased Garza's offense level by two points for obstruction of justice, finding that Garza had committed perjury during the trial, and also found that Garza played a managerial or supervisory role in the offense, warranting a three-level enhancement.

Defendant Dillard was also assessed a § 3B1.1 enhancement for his role in the offense at his sentencing. The district court agreed with the probation officer's recommendation that although Dillard's tenure in the conspiracy was short, "he was a key participant and served as a manager of criminal activity." The district court denied Dillard a reduction for acceptance of responsibility, despite the fact that Dillard had entered a plea of guilty to the conspiracy charge. The district court's finding was based in part on the probation officer's report that Dillard had provided the probation

officer with a less than candid written statement about his involvement in the offense.

## II. Analysis

### A. Defendant Garza's Conviction

■ Garza claims that his Sixth Amendment right to confrontation was violated when the district court limited his cross-examination of government witness Wilson as to Wilson's untruthful statements made during a polygraph examination. Garza argues that because Wilson's untruthful answers to the polygraph examiner were "false statements to a federal agent while cooperating with the government," they bear directly on Wilson's credibility and therefore, should not have been excluded. The four polygraph questions to which Wilson allegedly answered untruthfully were as follows:

1. Prior to this year, did you ever steal anything of value? No.

2. Before 1990 have you ever lied to keep yourself out of trouble? No.

3. Prior to this year, have you ever done anything for which you should have been arrested? No.

4. Before 1990 have you ever cheated anyone out of anything? No.

(Tr. 803–804). Garza wanted those four questions and answers be subjected to cross-examination without letting the jury know that Wilson had actually passed the polygraph examination. After a telephone *voir dire* of the polygraph examiner, the district court found that the probative value of cross-examining Wilson on this subject was outweighed by the prejudicial effect. *See* Fed. R.Evid. 403. Drawing on its own "twenty-five years of experience in the [polygraph] field," [6] (Tr. 806), the district court stated:

The purpose of those questions is to elicit deceptive answers so that the examiner has the opportunity to compare the polygraph results and reactions on the substantive questions with what are known lies.... The discrete elements of the test are not either material or relevant to anything else in the investigation. They are

---

**6.** Judge Lindberg was a former lie detector operator and had served as the general counsel and

vice president of a firm that specialized in the application of polygraph tests.

for the examiner's purpose in arriving at a conclusion as an expert.... And in that context I think it would be unfair and inappropriate and certainly not relevant to the issues in this case [to allow cross-examination of the four questions and answers].

(Tr. 806–807).

 It is well-established that the district court has "wide discretion in managing cross-examination and ruling on the admissibility of evidence." *United States v. Glecier,* 923 F.2d 496, 503 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or marginally relevant"). We have said that "a district court's Rule 403 balancing is afforded a special degree of deference: '[o]nly in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'" *Glecier,* 923 F.2d at 503 (quoting *United States v. Krenzelok,* 874 F.2d 480, 482 (7th Cir.1989)).

 We conclude that the district court did not abuse its discretion in limiting the cross-examination of Wilson concerning the polygraph questions. Given the limited purpose of the four test questions in the polygraph examination, we agree with the district court's reasoning that allowing this limited line of questioning[7] might very well have confused the jury and thus outweighs its probative value. Moreover, other than arguing that Wilson's false answers bear directly on Wilson's credibility, Garza fails to explain how he was prejudiced by the district court's Rule 403 ruling such that a reversal of his conviction is warranted. *See United States v. Sanders,* 962 F.2d 660, 679 (7th Cir.1992). In any event, "the Sixth Amendment only guarantees the defendant the opportunity for

effective, not limitless, cross-examination." *Id.* (quoting *United States v. Aguilar,* 948 F.2d 392, 397 (7th Cir.1991)). The record reveals that Garza was given wide latitude in cross-examining Wilson. For instance, Garza's counsel thoroughly cross-examined Wilson concerning Wilson's 1977 and 1989 theft convictions and his 1990 deceptive practices conviction. In fact, Garza admits that he was able to cross-examine Wilson as to Wilson's prior false statements and bad acts. Thus, based on the record before us, we do not agree that the trial court committed error in limiting Garza's cross-examination, and even if there was, the error was harmless. *See United States v. Dominguez,* 992 F.2d 678, 681 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993).

## B. Sentencing

### a. Acceptance of Responsibility

 Defendant Dillard argues that the district court erred in denying him a two-level reduction for acceptance of responsibility because he pleaded guilty to the conspiracy charged and "fully admitted his complicity in the crimes charged [in the plea agreement] and acknowledged the same in open court at the time of his plea of guilty." We review the district court's factual determination of whether a defendant has accepted responsibility for clear error. *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993); *United States v. Guadagno,* 970 F.2d 214, 224 (7th Cir.1992).

 A defendant who enters a guilty plea is not entitled to a reduction for acceptance of responsibility as a matter of right, U.S.S.G. § 3E1.1, comment. (n. 3); *Tolson,* 988 F.2d at 1497; *United States v. Ojo,* 916 F.2d 388, 393 (7th Cir.1990), but must timely own up to his actual offense. *United States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir.1990). Application Note 3 to § 3E1.1 provides:

Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct compris-

---

**7.** Garza argued before the district court that Wilson's untruthful answers to the four polygraph questions should be made known to the jury

without letting the jury know that they were part of a polygraph examination and that Wilson had passed the examination.

ing the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable ... will constitute significant evidence of acceptance of responsibility.... However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.

In this case, Dillard demonstrated conduct inconsistent with acceptance of responsibility. Following his guilty plea, Dillard submitted a written statement to the probation officer which was less than candid; he neither detailed his involvement in the offense such as the proceeds he profited from the conspiracy, nor gave a truthful account of the facts concerning his involvement. He claimed that he merely referred Stokes to a "banker" when dealing with the $1.2 million check and that the "banker" and Stokes "went outside to talk." The evidence, when reviewed in its entirety, demonstrates that Dillard actively participated in the attempted negotiation of the $1.2 million check and that it was he, not Stokes, who spoke in private with the "banker" concerning the check. Similarly, with respect to his dealings with Holloway and Tecia Green, Dillard attempted to minimize his role in the scheme. Although he acknowledged that Stokes had dropped off two checks in his office for Holloway, Dillard claimed that "after that [Holloway] and Stokes I assumed continued to do the same together until they were caught." Dillard's account did not comport with the evidence, which established that Stokes directly gave Dillard at least one more stolen check to negotiate and Dillard received at least one-third of the proceeds. In light of the fact that Dillard was less than truthful and failed to give a complete statement concerning his involvement in the check cashing scheme, the trial judge could find that Dillard fell short of meeting the standards for acceptance of responsibility.

### b. Role in the Offense

Both Dillard and Garza challenge the district court's finding of their managerial or supervisory roles in the offense. Section 3B1.1(b) of the Sentencing Guidelines provides that a three-level enhancement is warranted if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The central concern of § 3B1.1 is "relative responsibility." *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir.1991); *see also* U.S.S.G. § 3B1.1, comment. (bckg'd.). Factors the court should consider in determining whether a defendant occupied a leadership role or a mere managerial role, or whether a defendant qualified as a supervisor at all include:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n. 4); *see also United States v. Young*, 34 F.3d 500, 507 (7th Cir.1994); *United States v. Ramos*, 932 F.2d 611, 618 n. 14 (7th Cir.1991).

▮▮▮ The district court's finding that a defendant played a managerial or supervisory role is a finding of fact,[8] and thus, enjoys the protection of the "clearly erroneous" standard.[9] 18 U.S.C. § 3742(e); *United*

8. Indeed, in criminal cases under the Continuing Criminal Enterprise statute, 21 U.S.C. § 848, the defendant's status as a "manager" is a question of fact for the jury, and thus, the terms "managed," "supervised," and "organized" are interpreted according to their ordinary, lay meaning. *United States v. Mejia–Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989); *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984).

9. This is true, even though "the fact of manager status may be more difficult to ascertain than purely physical facts ... and may depend upon an assessment of the broad context of the crime." *Mejia–Orosco*, 867 F.2d at 221. In fact, § 3B1.1 is not the only guideline provision requiring district judges to make sophisticated factual determinations. Sections 3B1.2 (requiring the judge to decide whether the defendant was a "minimal participant" or "minor participant") and § 3B1.3 (requiring the judge to decide whether the defendant used a "special skill") demand fact finding of comparable complexity. *See id.*

States v. Vargas, 16 F.3d 155, 160 (7th Cir. 1994); United States v. Jackson, 983 F.2d 757, 762 (7th Cir.1993). Dillard argues that he was an "average participant" because "he did little other than make introductions, cash checks and share in a small portion of the total proceeds of the scheme." [10] However, Dillard recruited at least two "accomplices" into the conspiracy, and had a decision-making position in the operation stemming from Stokes's trust in allowing Dillard to recruit accomplices to participate in the criminal enterprise. He enlisted co-defendant Holloway, who in turn brought in Tecia Green. He also brought in one other "associate," whom he admitted in his plea agreement to be defendant Hall, to set up the "Fidelity Financial Investments" account under the name of "George Calderone." Although Hall was acquitted of the charge, the district court could still find by a preponderance of evidence, United States v. Banks, 964 F.2d 687, 692 (7th Cir.), cert. denied, — U.S. —, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992), that Dillard had recruited an additional person into the criminal operation for the evidence produced at trial established that someone other than Dillard had opened the account. It is true that eight persons were indicted on the basis of participating in the check cashing conspiracy ring at issue, and Dillard may very well not have had dealings with each and everyone of them, but under the law he is not required to. This court has said that "the plain language of § 3B1.1(b) requires only that a defendant was a manager 'and the criminal activity involved five or more participants'—not that a defendant managed, or controlled, the five or more participants." United States v. McGuire, 957 F.2d 310, 316 (7th Cir.1992) (quoting U.S.S.G. § 3B1.1(b)); see also United States v. Cantero, 995 F.2d 1407, 1414 (7th Cir.1993).

Moreover, even if it did not plainly appear that Dillard had exercised control over each and every individual in the conspiracy or had the authority to direct the action of each of them, "control over others is not the sine qua non of a finding that a person is [a] manager or supervisor." Young, 34 F.3d at 508 (citations omitted). For a defendant to qualify for the enhancement for managerial role, it may be enough that the defendant "orchestrated" or simply "coordinated" the activities of others. Vargas, 16 F.3d at 160 (citing United States v. Rivero, 993 F.2d 620, 624 (7th Cir.1993)). Dillard's is such a case. Dillard was the one Stokes relied on in finding someone to cash the $1.2 million stolen treasury check and the two subsequent checks, and was the one who helped Stokes develop the method for processing stolen checks. Meetings were held in Dillard's office and stolen checks were dropped off there. Dillard also had his secretary type some of the checks against the fraudulent accounts opened by Holloway and Tecia Green. He shared at least one third of the proceeds of the checks he was involved in, and his role was far more than a middleman. Cf. United States v. Brown, 944 F.2d 1377, 1381–82 (7th Cir.1991) (concluding that "middleman status alone cannot support a finding that a defendant was a supervisor, manager or leader of a criminal activity;" stating that if the government had shown the presence of some of the factors in the commentary to U.S.S.G. § 3B1.1, such as recruitment of accomplices, the result may well have been different). While Dillard's tenure in the conspiracy may have been relatively short, Dillard's participation in the operation was most critical to its success; the operation simply could not have flourished without his contacts and expertise. In light of Dillard's relative responsibility in the criminal organization,

**10.** During oral argument, Dillard's counsel raised a due process argument alleging that the government had breached the plea agreement. Santobello v. New York, 404 U.S. 257, 262–63, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). He contended that on appeal, the government should not have taken a position that was inconsistent with its representation to the probation officer that Dillard was an "average participant" in the conspiracy. We are of the opinion that the government's position was consistent: it made no

recommendation to the district court as to the role in the offense enhancement, nor did it say anything at sentencing that would constitute a sentence recommendation for an enhancement. More importantly, the plea agreement is silent as to whether Dillard qualified as a supervisor or a manager under U.S.S.G. § 3B1.1(b). The government made no agreement with Dillard with respect to his role in the offense, and thus cannot be said to have breached the plea agreement.

the district court did not clearly err in finding that Dillard played a managerial or supervisory role in the offense.

 Similarly, the district court could find that defendant Garza was a supervisor or manager in this criminal scheme. Garza was in charge of Stokes's criminal endeavor in Chicago while Stokes was in Georgia. He gave instructions to Wilson, exerting authority over Wilson, and held one of the two checks Stokes had left behind until he was confident that Wilson had followed his instructions with respect to the first check. He then sent the money withdrawn by Wilson to Stokes in Georgia. Moreover, as the district court emphasized, Garza recruited his girlfriend Lori Jones, who was relatively inexperienced in conducting fraud schemes, and directed her activities. He helped Jones obtain identifications under an assumed name, and drove Jones to the state capital in Springfield, Illinois to set up the phoney corporation. After various fraudulent accounts were set up, Jones wrote checks against them at Garza's direction, and was transported from bank to bank by Garza. In fact, when Garza was arrested while waiting outside the bank for Jones, the agents recovered a $9,000 check from Jones made payable to Garza.

Garza argues that the district court erred in relying on the government's witnesses whom the district court observed as not being "totally candid at all times." To the extent Garza challenges the district court's credibility determination, he cannot succeed. It is well-established that with respect to sentencing issues, "credibility judgments of witnesses are left to the sound discretion of the district court." *United States v. Campbell,* 985 F.2d 341, 347 (7th Cir.1993). The trial judge, in addition to having the opportunity to hear all the testimony and review all the exhibits, is in the best position to make credibility determinations when considering "'the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the

cold pages of an appellate record." *Tolson,* 988 F.2d at 1497 (quoting *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992), *vacated on other grounds by* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). Thus, we will not disturb the district court's resolution of whatever inconsistencies or ambiguities that exist in the government witnesses' testimony. *See Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) (fact-finder's choice between two permissible choices cannot be clearly erroneous).

### c. Obstruction of Justice

 For the same reason, Garza's challenge to the enhancement for obstruction of justice must fail. Under the Guidelines, a defendant can be given a two-level enhancement for obstruction of justice if he committed perjury. U.S.S.G. § 3C1.1, comment. (n. 3); *United States v. Robinson,* 30 F.3d 774, 787 (7th Cir.1994). The district court found that Garza committed perjury while testifying at trial. Garza argues that district court's finding was erroneous because the court improperly relied on the testimony of unreliable government witnesses and because the testimony was contradicted by his own testimony. Again, we refuse to second guess the trial judge's assessment of the reliability and credibility of the government's witnesses. *Campbell,* 985 F.2d at 347. On the other hand, we review the district court's finding of obstruction of justice under the clearly erroneous standard. *United States v. Price,* 988 F.2d 712, 721 (7th Cir.1993).

In *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993), the Supreme Court held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice or an attempt to do the same." *Id.* at ——, 113 S.Ct. at 1117; *see also Robinson,* 30 F.3d at 787–88. Although "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," it is sufficient "if the court makes a finding of an obstruction or impediment of

justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117; *see also United States v. Barker,* 27 F.3d 1287, 1293 (7th Cir.1994). Further, the Court noted that a testifying witness commits perjury if while under oath he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at ——, 113 S.Ct. at 1116; *see also Robinson,* 30 F.3d at 788.

In this case, the district court made a specific finding that Garza had committed perjury at trial. The finding is supported by the record as Garza's version of the facts was contradicted by the government witnesses' testimony and the government's contradictory version of events was corroborated by the use of fingerprint evidence, handwriting exemplars, as well as tape recordings. For instance, Garza denied ever seeing the $1.2 million check, but Stokes testified that Garza was one of the two people to whom he had shown the check. Although Garza testified that he was unaware of the Dillard–Holloway checks, handwriting evidence established that his signature was on two of the checks. He claimed that he had only spoken to Augusta Green on one occasion at a party in Houston, Texas, but his telephone records reflected otherwise, demonstrating that numerous calls were made from his phone number to Green's phone number. Garza denied meeting with Wilson on numerous occasions for the purpose of depositing stolen checks and withdrawing funds from the accounts, and also denied having Wilson's pager number or beeping Wilson in making the arrangements. But, in a taped conversation, Garza stated while conversing with Wilson that he had Wilson's pager number. Garza testified that he had no knowledge that Lori Jones was making use of Cynthia Blake's name and identifications. It is interesting to note that Garza's fingerprints were found on the "Cynthia Blake" birth certificate. It is clear that Garza's false testimony went to a material matter of the case because it bore directly upon the extent of his involvement in the conspiracy.

After listening to the parties' arguments as to the alleged specific instances of perjury, the court stated: "on the matter of the perjury and the obstruction of justice, I sat here, as did the jury and as did counsel. And there's no question in my mind that Mr. Garza was at times being very candid but also at times being very untruthful." We are of the opinion that the trial court's independent finding of perjury sufficiently encompassed the "factual predicates" required by *Dunnigan. See United States v. Sanchez,* 32 F.3d 1002, 1006 (7th Cir.) (district court's statement that it had heard the trial testimony and found that defendant "was so flagrant in his testimony and so unbelievable that [the court] will not tolerate that kind of conduct" was sufficient to meet the requirements of *Dunnigan* ), *cert. denied,* —— U.S. ——, 115 S.Ct. 346, 130 L.Ed.2d 302 (1994); *United States v. Rodriguez,* 995 F.2d 776, 779 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 648, 126 L.Ed.2d 605 (1993) (district court's determination encompassed the factual predicates required by *Dunnigan* where the court found that defendant "made a number of denials going to the very heart of the case," and that defendant's version of facts "simply didn't square with reality"). Therefore, we refuse to disturb the district court's factual determination of obstruction of justice.

### d. Calculation of Amount of Loss

Garza also challenges the district court's calculation of the amount of loss attributed to him. Based on the government's loss figure of $637,000 which represents the total amount of the stolen checks (except for the initial $1.2 million check) involved in the entire conspiracy, the district court found that Garza was responsible for between $500,000 and $800,000 of loss, a ·determination that resulted in a ten point increase under U.S.S.G. § 2F1.1(b)(1)(K). We review the determination of the amount of loss involved in the defendant's offense under U.S.S.G. § 2F1.1(b)(1) for clear error only. *United States v. Strozier,* 981 F.2d 281, 283 (7th Cir.1992).

Garza claims that it was improper to hold him accountable for all losses attributable to the entire conspiracy because he did not join

the conspiracy at the beginning and was acquitted of or not charged with other counts of the indictment. . Garza asserts, therefore, that the loss figure should be limited to his personal involvement, which was $480,000 warranting only a nine point increase. According to Garza, this is the correct assessment especially because there was not one single conspiracy but a series of conspiracies centered around Augusta Green and Robin Stokes. Because Garza failed to raise the multiple conspiracy argument before the district court, he has waived the issue. *United States v. Cotts,* 14 F.3d 300, 306 (7th Cir. 1994). Nor can Garza demonstrate plain error. The jury found beyond a reasonable doubt that Garza participated in a single conspiracy that covered the entire criminal operation. *See id.* at 304.

■ Under the Guidelines, a defendant convicted of taking part in a jointly undertaken criminal activity is sentenced based not only on his own acts but also on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Colello,* 16 F.3d 193, 197 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 878 (1994). Thus, Garza could be held accountable for the amount of loss reasonably foreseeable by him, even if he did not personally participate in the particular transactions. *United States v. Smith,* 897 F.2d 909, 911 (7th Cir.1990) (per curiam); *United States v. Savage,* 891 F.2d 145, 150 (7th Cir.1989). Moreover, in determining the appropriate Guidelines sentence, a court may consider activity of which the defendant has not been charged or convicted, so long as that activity is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *United States v. Salva,* 902 F.2d 483, 488 (7th Cir.1990).

The trial judge found that Garza was involved from the beginning of the conspiracy as he was one of the two people with whom Stokes discussed the $1.2 million check.[11] Garza knew that Stokes was attempting to get the stolen check cashed, and knew that the conspiracy was capable of obtaining large sums of money. Although the $1.2 million check was returned because of its large amount, he told Stokes "to look out for him" at the inception of this scheme, indicating his willingness and agreement to join the conspiracy. Thus, although Garza may not have actually participated in the group's cashing of the three stolen checks which ranged from $25,000 to $58,000, the district court was entitled to find, and in all probability did find, that they were within the contemplated scope of the conspiracy and were reasonably foreseeable to Garza. *Cf. Savage,* 891 F.2d at 151 (in a drug conspiracy, "[t]he amount of narcotics considered in sentencing for conspiracy includes not only the amount involved in the transactions that were known to the defendant but also those that were reasonably foreseeable, reflecting the fact that each conspirator is responsible for the acts and offenses of each one of his co-conspirators committed in furtherance of the conspiracy."). With respect to the remaining checks, Garza personally handled checks ranging from $22,000 to $91,000 and was intimately involved in the financial affairs of the criminal enterprise. Although Garza was acquitted of some of the bank fraud counts, we refuse to hold that the district court clearly erred in finding that they were part of the same course of conduct as the offense of Garza's conviction. Accordingly, we hold that the district court properly held Garza accountable for all of the checks successfully deposited by the group.

### e. Disparate Sentence

■ Garza next complains that his co-defendant, Stokes, who was the ring-leader

---

11. The district court stated:
 [T]he evidence which the jury appeared to believe, and certainly the court believed, was that Mr. Garza was in a way—if I can use the vernacular, he was there at the get-go with regard to the first check that had to be mailed back because it was too big for anybody to handle apparently. And it seems to me that the court would have to ascribe to Mr. Garza unusual naivete. And in the overall picture based on the excellent report of Miss Bowman, he is anything but naive. So I am going to deny the request for a calculation based on less than $500,000.
 Sentencing Tr. at 15.

and allegedly more culpable than he was, received a proportionately lesser prison term than he did; while Garza received a forty-six month prison term and five years of supervised release, Stokes, who had pleaded guilty, only received a 19 month sentence and three years of supervised release. Garza urges this court to remand the case to the district court to determine whether a downward departure is appropriate. We note as a preliminary matter that Garza never moved the district court for a downward departure based on disparity of sentences, and thus, he has waived the departure issue. *See United States v. Kelly*, 14 F.3d 1169, 1177 (7th Cir. 1994). In fact, even if he had requested a departure and the court refused to exercise its discretion to depart downward, we would be without jurisdiction to review the trial court's discretionary refusal for a downward departure. *United States v. Mittelstadt*, 969 F.2d 335, 336 (7th Cir.1992); *United States v. Poff*, 926 F.2d 588, 590 (7th Cir.) (en banc), *cert. denied,* — U.S. —, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991).

■ Moreover, as Garza acknowledged, a disparity among co-defendants' sentences is not a valid basis to challenge a guideline sentence otherwise correctly calculated. *United States v. Edwards*, 945 F.2d 1387, 1397–98 (7th Cir.1991); *Smith*, 897 F.2d at 911 ("[n]othing in 18 U.S.C. § 3742(a) ... allows review of a sentence imposed in conformity with the Guidelines on grounds that a codefendant was treated differently."). As we noted in *United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir.1990), "[t]here is no statement in the legislative history suggesting that sentences within the Guidelines should be reviewed because of a claim that a particular sentence is draconian or too lenient." If Garza is arguing that Stokes got less than he may have deserved, Garza gains no similar advantage by reason of Stokes' good fortune. *See United States v. Cea*, 914 F.2d 881, 889 (7th Cir.1990) ("*Cea I* "), *cert. denied,* — U.S. —, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992).

Even under pre-Guidelines sentencing procedure, disparity among sentences received by co-defendants was grounds for reversal only if the judge failed to give "thoughtful consideration" to the matter, *see United States v. Nowicki*, 870 F.2d 405, 409 (7th Cir.1989), and "mere disparity of sentences between co-defendants and co-conspirators cannot alone prove an abuse of [the district court's] discretion." *United States v. Coonce*, 961 F.2d 1268, 1282 (7th Cir.1992); *see also United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir.) (same), *cert. denied,* — U.S. —, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992). In *United States v. James*, 923 F.2d 1261 (7th Cir.1991), the defendant contended that he was subject to a harsher sentence than his co-defendants who had pleaded guilty simply because he exercised his right to a jury trial. We held that absent a showing that the district court relied on improper or unreliable information or failed to exercise any discretion at all, "the mere fact that a defendant who proceeded to trial received a heavier sentence than did a co-defendant who pleaded guilty does not establish an abuse of the trial court's discretion." *Id.* at 1270 (quoting *United States v. Fields*, 689 F.2d 122, 128 (7th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982)). Similarly, in *United States v. Cea*, 963 F.2d 1027 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992), the defendant was convicted by a jury and received a harsher sentence than his co-defendant, who had pleaded guilty. The defendant argued that by giving him a greater sentence, the district court in effect punished him for exercising his right to trial. We rejected the defendant's argument, holding that "the defendant's disparity of sentence argument is eclipsed by the district court's imposition of a sentence within the correct guideline range." *Id.* at 1033 (quoting *Cea I*, 914 F.2d at 889). As in *James* and *Cea* which are pre-Guidelines cases, what matters is that Garza's conduct and criminal history called for the sentence he received. As discussed before, the district court accurately calculated the amount of drugs attributable to Garza. The court also properly determined that Garza played a managerial role in the conspiracy as he exercised control over the actions of Wilson, recruited Jones into the conspiracy, and coordinated the check cashing scheme. Moreover, in contrast to his co-defendant Stokes who had clearly

demonstrated an acceptance of responsibility for his criminal conduct and cooperated fully with the government in this prosecution, Garza obstructed the administration of justice by committing perjury at trial (the district court specifically found that Garza was "at time being very untruthful"), calling for further enhancement of his sentence. Given Garza's managerial role in the conspiracy and his actions to impede the administration of justice, the district court appropriately found that Garza's guideline range was forty-six to fifty-seven months and imposed a sentence at the low end of that range.

### III. Conclusion

We AFFIRM Garza's conviction and sentence and Dillard's sentence.