108 F.3d 1380
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Randall D. WRIGHT, Defendant-Appellant.
 No. 96-3010.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 14, 1997.
Decided March 18, 1997.
 
 Before RIPPLE, MANION and EVANS, Circuit Judges.
 
 ORDER
 
 1
 A federal prosecutor referred to the criminal defendant Randall Dean Wright as a "bum" during the rebuttal closing argument at the trial of this case of stolen mail and fraud. Wright thinks this error warrants a new trial, but the district court disagreed. Wright also appeals two enhancements to the base offense level for his sentence. We affirm the judgment and sentence of the district court.
 
 I.
 
 2
 Michael Lane, a postman in Bloomington, Illinois, met Wright while walking his mail route. They became friends (it turns out they lived next door to each other) and began consuming alcohol and cocaine together 3 or 4 times per week. To support his cocaine habit, Lane started stealing credit cards (as well as credit card convenience checks) from the citizens on his mail route. Lane would hold the card until the personal identification number came through the mail a few days later. Then he would use the credit card at an automated teller machine to obtain cash which he would use to buy illegal drugs, including crack cocaine.
 
 
 3
 During the fall of 1994 Lane stole between 7 and 12 credit cards, as well as several credit card convenience checks. With the first stolen credit card, Lane withdrew approximately $7,400 from various automated teller machines in Bloomington. Lane discussed this money with Wright, including how Lane had stolen it. Wright took about $400 of the money. Lane used some of this money to buy "a bunch of crack" which Lane and Wright consumed. At first, Lane would buy drugs from Wright and Maria Ruiz, Wright's live-in girlfriend. Later, Lane bought the drugs directly from Wright's suppliers.
 
 
 4
 Together, Lane and Wright used a second credit card to secure $2,000 in cash which they also used to purchase crack. At one point, Wright told Lane he had a friend who "could pass any credit card." When Lane was reluctant to turn the cards over to Wright for this purpose, Wright threatened to turn Lane in to his postal supervisors. Eventually, Lane gave several credit cards to Wright, who said he would burn them in his grill. A witness, Debbie Carlin, observed Wright take a stack of credit cards and blank credit card convenience checks from Lane. On another occasion, Wright specifically asked for and received from Lane a third credit card. Wright told Lane he "needed the card because he needed the money and stuff, and your [Lane's] job is at stake...." Lane gave Wright the card to keep Wright happy.
 
 
 5
 Ruiz first got involved in the scheme in early December 1994 during a trip to Peoria, Illinois. Wright gave Ruiz the third credit card to use when she went shopping. At Wright's direction, she used the card on several occasions to purchase gas, food, and clothing. Wright also had Ruiz approach their host in Peoria, Rosalind Campbell, to have her cash one of the credit card convenience checks at Campbell's bank. When Wright gave Ruiz the check it had already been filled out except for the "Pay to the Order" portion. Rosalind refused to cash the check. Later, Wright had Ruiz cash the check at the Illinois State University Credit Union in Bloomington.
 
 
 6
 As a result of the stolen credit cards, the U.S. Postal Service began to investigate. Lane was questioned and admitted certain involvement, but shielded Wright. Lane resigned from the postal service and broke off his friendship with Wright. A postal inspector contacted Ruiz. Before she met with the inspector, however, she called Wright, who instructed her not to talk with the inspector. Around this time the inspector contacted Wright concerning Ruiz's location. Wright got "very hostile" with the inspector, and lied to him that Ruiz was not home. Wright told the inspector that neither he nor Ruiz had any involvement in Lane's criminal activities. Ruiz provided fingerprint and handwriting exemplars to the inspector anyway.
 
 
 7
 The inspector then re-interviewed Lane, who acknowledged the involvement of Wright and Ruiz with the stolen mail. During the grand jury investigation of these events, Lane contacted the inspector to alert him that Wright had threatened him. Lane was afraid of Wright and was staying at a friend's house. According to Lane, Wright unexpectedly showed up there, and told Lane that "we are bro[ther]s and how I could either walk out of prison or being [sic] carried out, and how if I didn't--I think he could take care of me and stuff if I went to prison and got out, he'd set me up and stuff with employment, you know, stuff like that." Ruiz recalled the same incident, and that Wright told Lane "[a]re we clear with what I had told you?"
 
 
 8
 Wright was charged with conspiracy (18 U.S.C. § 371), trafficking in unauthorized access devices (18 U.S.C. §§ 1029(a)(2)), and two counts of possession and concealment of stolen U.S. Mail (18 U.S.C. §§ 1708). Lane and Ruiz each pleaded guilty to the conspiracy and theft of mail counts. Following a 2-day trial, a jury found Wright guilty on all charges in the indictment against him. The district court sentenced Wright to 24 months imprisonment for each of the 4 counts, the sentences to run concurrently, followed by 3 years of supervised release, and also ordered restitution of $12,502.98. The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231, and this court has jurisdiction over it pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).
 
 II.
 A. Government's Rebuttal Closing Argument
 
 9
 Wright charges one of the two Assistant U.S. Attorneys who prosecuted this case with misconduct during the rebuttal closing argument. Although defense counsel's closing argument to the jury was not transcribed, it apparently included an argument critical of the testimony of Ruiz, a key government witness. The prosecutor responded
 
 
 10
 I want to put something to rest right here at the outset. The remark about where are these charges for Maria Ruiz if she was a battered person is one of the more crass arguments that you've ever heard or will ever hear in a final argument. Probably nobody on the face of the earth besides Maria Ruiz knows what feelings of either affection or fear kept her going back to this bum. And Mr. Toner would stand up here and say count that as a credit to Mr. Wright. You see, it's Mr. Wright who encouraged the misjudgment and this feeling of affection and fear that drove her back to him time and again. Mr. Toner says you count that as a credit to Mr. Wright.
 
 
 11
 [Tr. p. 245] (emphasis supplied). Wright's trial counsel did not object to the characterization of Wright as a "bum," either during the prosecutor's rebuttal or afterward. Within a few minutes of the prosecutor's comment, the district judge noted its impropriety. Directly after the argument ended, Judge McDade told the jury:
 
 
 12
 [T]he only comment I would like to add is that it happened so fast that I wasn't able to react to it, but I think Mr. Murphy's characterization of the defendant was inappropriate. I don't think that his personal opinion as to the defendant is relevant in this case, so I will ask you to disregard that particular statement that Mr. Murphy made about the defendant.
 
 
 13
 [Tr. 252] The case was then submitted to the jury for its consideration.
 
 
 14
 Wright's argument amounts to an allegation of a due process violation of his right to a fair trial. See Darden v. Wainwright, 477 U.S. 168, 181-82 (1986). Where the alleged error concerns prosecutorial misconduct during a closing argument, first we look at whether the comment in isolation was improper. United States v. Badger, 983 F.2d 1443, 1450 (7th Cir.), cert. denied, 508 U.S. 928 (1993). If the comment was proper, the inquiry ends. If it was not, we examine the comment in light of the entire record to determine if the defendant was deprived of a fair trial. Id. For the second part of this analysis, we consider five criteria: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether defense counsel's conduct invited the prosecutor's comment; (3) whether the district court adequately instructed the jury; (4) whether the defense counsel had an opportunity to counter the improper comment, and (5) the weight of the evidence against the defendant. United States v. Akinsanya, 53 F.3d 852, 857 n. 2 (7th Cir.1995).
 
 
 15
 Normally, we would review this challenge to the district court's refusal to grant a new trial for abuse of discretion. But as Mr. Wright acknowledges, his failure to object to the comment means it was not properly preserved for appeal. Thus, we review this issue for plain error. United States v. Anderson, 61 F.3d 1290, 1299 (7th Cir.), cert. denied, 116 S.Ct. 543 (1995). Under this standard, we will reverse the district court's decision only where "a miscarriage of justice would otherwise result." United States v. Woody, 55 F.3d 1257, 1272 (7th Cir.), cert. denied, 116 S.Ct. 234 (1995).
 
 
 16
 The prosecutor's remark was improper (The government's argument to the contrary in its brief--that "bum" could conceivably accurately reflect Wright's employment and/or economic status--does not convince us. At oral argument, after considerable prodding by the court, different government counsel admitted the remark was inappropriate.) But the comment did not deprive Wright of a fair trial. First, it would be rare that a single word used in reference to a defendant on a single occasion could rise to the level of a "miscarriage of justice" requiring reversal. The prosecutor's inappropriate characterization was one word in 33 transcript pages of closing argument. Considering the unsuitable remark in light of the entire record, this was not serious prosecutorial misconduct. Second, defense counsel's argument did not invite the prosecutor's remark, or somehow excuse it. Apparently the defense was trying to portray Wright as someone decent and who cared for Ruiz. Instead, she lied about being battered because no charges were filed. Ruiz had the motive to lie to the jury because she was bad. This "spin" caused the prosecutor to respond with a derogatory characterization by speculating why she kept "going back to this bum." Third, the district court gave a specific corrective jury instruction that was appropriate, timely, directly to the point, and which the jurors could easily follow. The district court also gave general instructions about closing arguments and what should be remembered and disregarded which overcame any prejudice arising from the prosecutor labeling Wright a "bum" on one occasion in a rather remote context. Fourth, although defense counsel did not have an opportunity to counter the improper comment, he did not object to it either.[1] Fifth, and finally, the weight of the evidence against the defendant (which Wright does not challenge the sufficiency of)--four witnesses testifying to Wright's direct and deep involvement with the stolen credit cards and checks--is overwhelming. See Akinsanya, 53 F.3d at 857 ("it is rare that improper comments made during closing argument rise to the level of reversible error"). Although the prosecutor made a mistake--one which he should not defend--ultimately, the utterance of this word during the rebuttal closing argument was harmless.
 
 
 17
 B. Sentencing Enhancement for Role In The Offense
 
 
 18
 Wright also challenges the district court's finding that he played an aggravating role in the offense under USSG § 3B1.1(c), which provides for a two-level increase in a defendant's base offense level if he "was an organizer, leader, manager, or supervisor" in the criminal offenses. Wright asserts that Ruiz's testimony, from which the district court concluded he supervised her, is unreliable, uncorroborated, and insufficient to support the court's finding concerning the defendant's role in the offense, which enjoys the protection of the clearly erroneous standard. 18 U.S.C. § 3742(e); United States v. Dillard, 43 F.3d 299, 306, 307 (7th Cir.1994).
 
 
 19
 Contrary to Wright's assertion, the witnesses' trial testimony does support the district court's conclusion that Wright supervised Ruiz. Wright instructed her what to do with the third credit card, as well as with a convenience check. Wright gave her these items, told her how to use them, and told her to ask Rosalind Campbell to cash the check for him. Wright does not dispute that he knew the check was stolen and cashed on his bank account. Wright instructed Ruiz to purchase certain items with the credit card. Ruiz testified that it was always Wright, never Lane, who instructed her how to use the credit card and convenience check. Further, and importantly, the record reflects that Ruiz lived in some fear of Wright. Although Wright points to a lack of corroboration of some of Ruiz's testimony, he does not point to any contradiction of her statements.
 
 
 20
 This court will affirm the sentencing court's findings if they are adequately supported by the factual record. The district court sat through the entire trial, observed the witnesses, and believed that Wright supervised Ruiz. We will not disturb the district court's credibility determination with respect to such a fact-bound, witness-specific conclusion when the record reveals a solid basis for it. See Dillard, 43 F.3d at 308. Such is the case here. Wright has not directed us to facts in the record that demonstrate the district court was clearly erroneous in finding his role in this scheme to be supervisory, or in increasing Wright's base offense level due to this role.
 
 
 21
 C. Sentencing Enhancement for Obstruction of Justice
 
 
 22
 Wright also argues that the district court erred when, in calculating his sentencing guidelines, it found he had obstructed justice by threatening Lane. He claims the district court relied on inaccurate information to so conclude. USSG § 3C1.1 provides for a two-level increase if a defendant willfully attempts to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the offense. This includes an attempt to threaten, intimidate, or unlawfully influence a co-defendant. USSG § 3C1.1 Application Note 3(a).
 
 
 23
 The district court found as a matter of fact that Wright threatened Lane. Lane's testimony does indicate he was "hiding out." Considering that Lane had alerted the postal inspector to Wright's role in this scheme, it is fair to infer that Lane was hiding from Wright. The record also shows that Wright did not want Lane or Ruiz testifying against him. Also, Ruiz, Lane, and the postal inspector corroborated Wright's statements, supra p. 3, which arguably are threatening in nature.
 
 
 24
 At Wright's sentencing, the district court found that Wright threatened Lane "as set forth in paragraph 30 of the presentence report." Wright argues that this paragraph does not establish that he threatened Lane. We note, however, that the district court's finding came after the prosecutor's recitation of all the trial evidence. The district court's finding on this point surely did not ignore that evidence. Although Wright can argue that his comments to Lane are not necessarily threatening, that is not how Lane or Ruiz took them, nor how the district court concluded they should be taken. Again, on a fact-bound, testimony-driven determination such as this, we defer to the district court, which heard the witnesses describe this threat incident. Wright has not established that the district court was clearly erroneous in finding that Wright threatened Lane, or in increasing Wright's base offense level as a result of this threat.
 
 III.
 
 25
 For the foregoing reasons, we AFFIRM the judgment and sentence of the district court.
 
 
 
 [1]
 We understand defense counsel's rejoinder that professional courtesy and desire not to reinforce the remark in front of the jury may have resulted in him refraining from objecting at the time the remark was made. This does not explain, however, why he did not place an objection on the record after the argument ended, outside the jury's presence. This failure could indicate the absence of any actual "sting" of the comment