**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

Victor E. **ROBBINS,** Sr., a/k/a Gene, Roy G. Robbins, a/k/a Gordon, and James Herriman, Defendants–Appellants.

No. 98–1515, 98–1657, 98–2663.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1999.

Decided Nov. 19, 1999.

Winfield D. Ong (argued), John Earl Dowd, Office of U.S. Attorney, Indianapolis, IN, for plaintiff–appellee in No. 98-1515.

Winfield D. Ong (argued), Judith A. Stewart, Office of U.S. Attorney, Indianapolis, IN, for plaintiff–appellee in Nos. 98-1657, 982663.

Tonya J. McMath (argued), Phoenix, AZ, for defendant–appellant Victor Robbins.

Thomas M. Dawson, David V. Ayres (argued), Leavenworth, KS, for defendant–appellant Roy Robbins.

Kevin Scionti (argued), Kenneth T. Roberts, Roberts & Bishop, Indianapolis, IN, for defendant–appellant James Herriman.

Before RIPPLE, MANION and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

The appellants, Victor Eugene Robbins, Sr. ("Gene"), Roy Gordon Robbins ("Gordon") and James Herriman, were charged in a three-count indictment with various offenses arising out of a large-scale marijuana operation. Count I charged the defendants with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged Mr. Herriman with possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count III charged Gene Robbins and Gordon Robbins with money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I).[1]

After a 7-day trial, the jury returned verdicts of guilty as charged as to each defendant. Gene Robbins was sentenced to 264 months imprisonment, 5 years su-

---

1. The indictment also charged three additional defendants, Manuel Amezquita, Hector Ramirez and Irineo Rodriguez, with possession with intent to distribute marijuana. These defendants pleaded guilty prior to trial.

pervised release, and fined $25,000. Gordon Robbins was sentenced to 236 months imprisonment, 5 years supervised release, and fined $25,000. Mr. Herriman was sentenced to 180 months imprisonment, 5 years supervised release, and fined $5,000. Each defendant now appeals his conviction and sentence. For the reasons set forth in the following opinion, we affirm the judgments of the district court.

# I

## BACKGROUND

In approximately January 1996, Gene Robbins asked an acquaintance, Owen Osborne ("Osborne"), to rent a truck and to drive that truck to Indianapolis. Gene Robbins gave Osborne the telephone number of Mr. Herriman and told him to call that number when he arrived in Indianapolis. As instructed, Osborne drove from Arizona to Indianapolis, then called Mr. Herriman. Osborne and Mr. Herriman then unloaded several boxes from a truck into a storage unit. Mr. Herriman told Osborne that the boxes contained marijuana. The two also rented other storage units in the same storage area and used them to store both marijuana and other equipment necessary for a marijuana operation. When Osborne returned to Phoenix, Gene Robbins confirmed that the shipment had, indeed, been marijuana and paid Osborne approximately $5,000 as well as his travel expenses. Gene Robbins further agreed that he would pay Osborne $10,000 for future shipments of marijuana and told him that, in the future, he should rent a truck in Las Vegas. He also gave Osborne about $1,500 to obtain used furniture to put in the truck to mask the real nature of the shipment.

A week later, Gene Robbins instructed Osborne to transport another load of marijuana. As previously agreed, Osborne then rented a truck in Las Vegas, returned to Phoenix and was directed by Gene Robbins to leave the truck in a particular location. After Osborne learned that the truck had been loaded, he loaded the used furniture in the truck and drove to Indianapolis. Upon arrival, he contacted Mr. Herriman and at Mr. Herriman's instruction he left the truck at a designated location and flew back to Phoenix. Gene Robbins told Osborne that he had been transporting about $400,000 when he was stopped by an Illinois state trooper on Interstate 70.

Gene Robbins consented to a search of the vehicle and the trooper found 31 bundles of currency, totaling $400,770, in the spare tire. Mr. Herriman, who also knew about the incident, later related this story to his fiancée, Myrna Roberts, and at the same time told her that he and Gordon Robbins were selling marijuana together. Later, in March 1996, Osborne again rented a truck in Las Vegas. The truck was loaded with 8 or 10 boxes of marijuana and he again traveled to Indianapolis and met Mr. Herriman. They unloaded the truck at the storage unit. Osborne also met Gordon Robbins.

In August 1996, after driving another load of marijuana from Phoenix to Indianapolis at Gene Robbins' instruction, Osborne was instructed further by Gordon Robbins to drive 400 lbs. of marijuana to Ann Arbor, Michigan. Osborne loaded the marijuana and delivered it to Ann Arbor. He then returned to Phoenix with $400,000 for Gene Robbins. In September 1996, Osborne made another trip to Indianapolis on Gene Robbins' instructions. After arrival in Indianapolis, he then delivered about 400 lbs. of marijuana to Atlanta at Gordon Robbins' direction and repeated the trip at Gene Robbins' instruction. Later, in November, Gene Robbins directed Osborne to transport marijuana to Indianapolis. Upon arriving in Indianapolis, he was instructed by Gordon Robbins to take 700 lbs. of marijuana to Long Island, New York. He later received instructions to deliver 200 lbs. of marijuana to Ann Arbor. He then returned to New York to pick up the load he had previously delivered be-

cause it had been rejected as inferior in quality.

Osborne's trips between Phoenix and Indianapolis continued into the early months of 1997. He would deliver the marijuana to the Midwest and return to Phoenix with the money. These runs came to an abrupt end when Osborne, traveling with 1,200 lbs. of marijuana, was stopped and arrested on Interstate 70 near Alton, Illinois by an Illinois state trooper. The officer found the marijuana surrounded by some old furniture. He also seized documents with Mr. Herriman's pager and home phone numbers and Gordon Robbins' pager, cell and home phone numbers written in code. Osborne agreed to cooperate with law enforcement authorities and to make the planned delivery in Indianapolis.[2]

After Osborne agreed to cooperate, a tape recording was made of a telephone conversation between Osborne and Mr. Herriman during which the men arranged for the delivery of the marijuana. Osborne met Mr. Herriman as planned and a videotape was made of the delivery. Osborne wore a transmitting device to record his conversations with Mr. Herriman. In the course of the delivery, Mr. Herriman explained that they had to wait for "the Mexicans" to pick up the truck (Gene Robbins had told Osborne to deal with several Mexicans in Indianapolis). Mr. Herriman also told Osborne that Gene Robbins had called to see if he had arrived. Law enforcement officers followed the truck after its pick up by Amezquita, one of the Mexicans. The officers observed several people carry the marijuana into a mobile home. The officers obtained Amezquita's consent to search the mobile home, and they found a variety of implements used in the marijuana trade and over $9,000 in cash. Amezquita and two other confederates were later arrested. Amezquita, an illegal alien, had met Gordon Robbins in India-

napolis and had arranged to package marijuana into smaller bundles in return for money and living expenses. Mr. Herriman was arrested by the DEA after the truck was picked up by Amezquita.

## II

## DISCUSSION

### A. Mr. Herriman's Request for Mistrial

■ Mr. Herriman claims that the district court erred in not granting him a mistrial. During his testimony the arresting officer, DEA Agent Baker, related the circumstances surrounding Mr. Herriman's apprehension. He testified that another officer had read Mr. Herriman his rights; then, Baker continued, "He [Mr. Herriman] didn't wish to speak with us." Tr. at 232. Mr. Herriman moved for mistrial on the ground that this testimony, by pointing out that he did not want to speak with the officers, constituted an impermissible violation of his Fifth Amendment right against self-incrimination. He contends that the officer's reference suggested that he was unwilling to explain his part in the Robbins operation and his relationship with Osborne. The district court denied the motion for mistrial but gave a curative instruction.

■ In *United States v. Benitez,* 92 F.3d 528 (7th Cir.1996), we said that a "prosecutor violates a defendant's Fifth Amendment right not to testify at trial by directly and adversely commenting on the defendant's failure to testify on his own behalf." *Id.* at 535 (citing *United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995)). We added, however, that improper references to a defendant's decision not to testify "occur when the defendant is able to establish that the prosecutor 'manifestly intended' to refer to the defendant's silence, or when the statement was of such a

2. Osborne later pleaded guilty to felony charges of distributing marijuana in the Southern District of Illinois, but was granted limited immunity for his testimony against the

six defendants charged in the current indictment. His proffer letter required him to submit to a polygraph examination at the Government's discretion.

character that the jury could only interpret it to be a comment on the defendant's silence." *Id.* In this case, the evidence of record does not establish that the prosecutor "manifestly intended" to refer to the defendant's silence. However, the remark can be construed as an indirect comment on the defendant's failure to testify on his own behalf, or, at the very least, as a statement that the jury could only interpret as a comment on the defendant's silence. We shall assume, therefore, that the admission of the agent's testimony was in fact erroneous. However, to succeed on his claim, Mr. Herriman must establish that the testimony "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citation omitted). As we stated in *United States v. Reed,* 2 F.3d 1441 (7th Cir.1993), *cert. denied,* 510 U.S. 1079, 114 S.Ct. 898, 127 L.Ed.2d 90 (1994):

> When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper, our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial.

*Id.* at 1450 (quoting *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.), *cert. denied,* 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993)). *See also United States v. Osuorji,* 32 F.3d 1186, 1191–92 (7th Cir.1994), *cert. denied,* 513 U.S. 1119, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995).

■ We do not believe that this one misstep on the part of the prosecution in the midst of a 7–day trial with over 1,200 pages of transcript and hundreds of exhibits including a videotape that shows Mr. Herriman engaged in a marijuana transaction with Osborne can be fairly characterized as infecting the entire trial with unfairness. We note that the court gave a

curative instruction to the jury and specifically told it that the testimony was irrelevant and no indication of anything improper on the part of Mr. Herriman. Errors that are the subject of curative instructions are presumed harmless. *See Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *United States v. Moore,* 115 F.3d 1348, 1358 (7th Cir. 1997).

## B.  Admission of Exhibit 187

■ During the course of the Government's case, the district court admitted Exhibit 187, which was a summary of voluminous documents that already had been admitted into evidence and which corroborated the testimony of Osborne that the jury already had heard. Prior to the admission of this exhibit, Osborne had testified that he had made numerous trips around the country at the direction of the defendants to pick up and deliver marijuana. The exhibit summarized this documentary evidence which was comprised of telephone records, hotel and truck rental receipts, and credit card charges. The material was organized under headings that described the various trips to which Osborne had referred during his testimony. Mr. Herriman and Gordon Robbins submit that the district court committed reversible error in admitting this document. They acknowledge that Federal Rule of Evidence 1006 permits the presentation in chart or summary form of writings, recordings or photographs that cannot be conveniently examined in court. They nevertheless contend that it was improper for the district court to admit this chart because it permitted the Government to "vouch" for its witness and thereby undermined the jury's role as an independent fact finder. In their view, the labeling of the trips as "marijuana trips" on the exhibit amounted to improper vouching for the credibility of Osborne by IRS Special Agent Weida. They further argue that the "marijuana trips" label was improper because it contained Agent Weida's opin-

ion that Osborne was credible, a point to which he could not have testified to himself.

We do not believe that the district court abused its discretion in admitting this exhibit. In *United States v. Swanquist*, 161 F.3d 1064, 1072–73 (7th Cir.1998), we rejected the argument that summary charts that are supported by evidence already before the jury are impermissible. The basic purpose of this summary exhibit was to recapitulate the numerous and voluminous exhibits that had already been introduced into evidence and that were difficult to sort out. The exhibit simply summarized this documentary evidence. Indeed, each entry lists the specific exhibit number of the original document. The headings to which the defendants object are grounded in the testimony of Osborne, and merely summarized what he said.

### C. Admissibility of Hearsay Statements

■ One of the Government's witnesses at trial was Myrna Roberts, the former fiancée of Mr. Herriman. Roberts testified that Mr. Herriman had told her that, for his living, he "sold pot" with Gordon Robbins. Gordon Robbins appeals the district court's admission of Roberts' testimony.[3] He contends that his co-defendant's statement should not have been admitted under Rule 804(b)(3) of the Federal Rules of Evidence. That hearsay exception allows certain hearsay statements of unavailable declarants into evidence when the statements are against the declarant's interest.[4] Gordon Robbins further submits that he was denied his Sixth Amendment right to cross-examine Mr. Herriman's incriminating statement against him.

■ We review a district court's decision to admit a particular hearsay statement under an abuse of discretion standard. *See United States v. Amerson*, 185 F.3d 676, 681 (7th Cir.1999); *American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 540 (7th Cir.1999) ("We review the . . . construction of the evidentiary rules de novo and [the] application of the rules for abuse of discretion."). A ruling on the admissibility of such a statement is often a fact-bound determination. District court judges, "who are close to the facts and far better able to evaluate the various circumstances than an appellate court, therefore must be given wide discretion to examine a particular statement to determine whether all or part of it should be admitted." *Williamson v. United States*, 512 U.S. 594, 621, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (Kennedy, J., concurring in the judgment). However, "when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause."

---

**3.** In his reply brief, Gene Robbins also objects to Robert's testimony reporting Mr. Herriman's statements that implicated him. Roberts testified that Mr. Herriman told her that Gene Robbins had been arrested in Illinois and that a lot of money, "about a half million," tr. 333, had been found in the tire rim of the van he was driving—money that he would "have to pay back." Tr. 334. Gene Robbins claims that her testimony was incriminating to him and that Gordon's argument was applicable to him. However, contentions that are not presented as independent arguments in an opening brief are waived on appeal. *See United States v. Stockheimer*, 157 F.3d 1082, 1087 (7th Cir.1998), *cert. denied*, — U.S. ——, 119 S.Ct. 1127, 143 L.Ed.2d 121 (1999).

**4.** The rule states:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3).

*Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999).

### 1.

■■■ In determining the admissibility of a statement under Rule 804(b)(3), we require that three elements be met: (1) the declarant must be unavailable; (2) the statement must be against the declarant's penal interest; and (3) corroborating circumstances must exist indicating the trustworthiness of the statement. *See Amerson,* 185 F.3d at 681; *Fishman,* 175 F.3d at 540. We also require the proponent of the out-of-court statement to bear the burden of showing that the statement qualifies under Rule 804(b)(3). *See Fishman,* 175 F.3d at 540 (citing cases). In this case, the district court originally had granted the defendants' motion in limine to exclude the testimony of Myrna Roberts concerning statements made to her by Mr. Herriman about Gordon Robbins. However, the court conducted a hearing on the Government's motion to reconsider that ruling; outside the presence of the jury, it heard Roberts' testimony and the arguments of counsel. The court then found that the evidence was relevant, probative and admissible against Mr. Herriman; that the statement was clearly against penal interest and was sufficiently trustworthy to be admissible; and that Mr. Herriman obviously was not available to be questioned about the statements.[5] Finally, the court stated that the limiting instructions would curb the potential prejudice to Gordon Robbins. It then allowed Roberts to testify to the jury concerning the statements

Mr. Herriman made about the other two defendants, subject to limiting instructions.

Before the jury, Roberts testified that Mr. Herriman had told her that he and Gordon Robbins sold marijuana for a living. At that point, the court gave its limiting instruction that the statement was admissible only against the defendant Mr. Herriman and was not evidence against either of the other defendants.[6]

■■■ The district court admitted Roberts' testimony under Rule 804(b)(3) as an out-of-court statement made against the declarant Mr. Herriman's interest; indeed, Mr. Herriman has not appealed that ruling. We agree that, to the extent the statement inculpates Mr. Herriman himself, it is admissible under that evidentiary rule:

> Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.

*Williamson,* 512 U.S. at 599, 114 S.Ct. 2431. However, the rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory," *id.* at 600–01, 114 S.Ct. 2431, except in certain circumstances. The issue here is whether it was error to admit the statement that Mr. Herriman *and* Gordon Robbins were in the marijuana business together, in light of the fact that the statement inculpated Gordon Robbins, a criminal co-defendant, as well as the declarant. *See United States v. Nagib,* 56 F.3d 798,

---

5. We note that Mr. Herriman, as a codefendant in this case, was not subject to being called by the Government in its case-in-chief. He therefore clearly was unavailable within the meaning of Fed.R.Evid. 804(a)(1). *See United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985).

6. Roberts also testified that, when she took a trip with her fiancé to Arizona, Mr. Herriman took a lot of cash in a potato chip can or cracker box to Gordon Robbins in Arizona. At that point, the court again gave a limiting

instruction. Roberts stated, as well, that Mr. Herriman would tell her that Gordon had called or paged him; then he would leave. She further testified that Mr. Herriman told her that Owen Osborne was a truck driver who drove marijuana from Arizona to Indianapolis. She also told the jury that, when she was at Gordon Robbins' house shortly before he was arrested, he said "that he was just waitin' for them to come and get him any time" and that "the business was over." Tr. 342.

804 (7th Cir.1995) (noting that "each portion of the proffered out-of-court statement must be examined" in light of *Williamson* ); *United States v. Matthews,* 20 F.3d 538, 545 (2d Cir.1994) ("The difficulty is that if the statement against penal interest is multi-faceted, its facets may not be uniformly trustworthy.").

### 2.

### (a)

■ Gordon Robbins claims that Roberts' statement was barred by the Confrontation Clause. He submits that the district court, by admitting Mr. Herriman's out-of-court statement that Gordon Robbins was in the business of selling marijuana with Mr. Herriman, violated his right "to be confronted with the witnesses against him." U.S. Const. amend. VI.

In *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), the Justices of the Supreme Court, albeit in a plurality opinion, provided additional guidance to assist a court in deciding "whether the [Confrontation] Clause permits the government to deny the accused his usual right to force the declarant 'to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth." ' " *Id.* at 1894 (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote and citation omitted)). The Justices explained that, ever since *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court has "consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person." *Lilly,* 119 S.Ct. at 1896. Noted the Justices:

> [T]he veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) "the evidence falls within a firmly rooted hearsay exception" or (2) it contains "particularized guarantees of trustworthiness"

such that adversarial testing would be expected to add little, if anything, to the statements' reliability.

*Id.* at 1894 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). With respect to that first prong, the Justices found that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." *Id.* at 1899. It based its conclusion on the fact that

> our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those "hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability."

*Id.* at 1898 (quoting *White v. Illinois,* 502 U.S. 346, 357, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)). Given the Justices' guidance in *Lilly,* we cannot regard the admission of Roberts' testimony as satisfying the first prong as a "firmly rooted hearsay exception," *see id.* at 1899 n. 5. We therefore must conduct an independent review of whether Mr. Herriman's hearsay statement was admissible because it "possess[ed] indicia of reliability by virtue of its inherent trustworthiness." *Id.* at 1901. As Justice Scalia, in his concurrence in *Williamson,* pointed out, "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant." 512 U.S. at 606, 114 S.Ct. 2431 (Scalia, J., concurring).

We believe that the statement in question must be considered as possessing sufficient indicia of reliability to warrant its admission. First, we are satisfied that the statement is not of the type whose reliability is particularly suspect—such as a confession that shifts or spreads blame from the declarant to incriminate co-criminals, or a custodial confession made to law en-

forcement authorities, where the declarant responds to the leading questions of officers without any opportunity for contemporaneous cross-examination. *See Lilly,* 119 S.Ct. at 1900–01. Rather, we believe that Mr. Herriman's statement to Roberts had sufficient indicia of reliability present at the time the statement was made to make it trustworthy. The statement was made voluntarily in a conversation with Roberts, the declarant's fiancée and confidante. The circumstances in which the statement was made provide no reason to suspect any coercion, any ulterior motive, any desire to curry favor with authorities, any reason not to tell the truth. *See Fishman,* 175 F.3d at 540–41; *Nagib,* 56 F.3d at 805. Mr. Herriman's statement that he and Gordon Robbins were in business together selling marijuana equally inculpated them both. In sum, we hold that, in the totality of the circumstances, the statement had sufficient "particularized guarantees of trustworthiness" that its admission did not violate Gordon Robbins' rights under the Confrontation Clause.[7]

**(b)**

Our case law makes clear that, once a statement is admissible under the Rules of Evidence, the statement must meet a two-part test to determine whether it is nevertheless violative of the defendant's confrontation rights. *See United States v. Gio,* 7 F.3d 1279, 1288–89 (7th Cir.1993). The first part of that test is met easily because it is not disputed that Mr. Herriman made the statement. The second part of the test requires that there must be circumstantial evidence supporting the reliability of the statement. In addition to the circumstances surrounding the utterance, which we have just described, the record contains other evidence of Gordon

Robbins' complicity in the marijuana scheme to corroborate the statement. Finally, we note that, because the statement would have been admissible against Gordon Robbins under the Rules of Evidence, the narrow rule of *Bruton* is not implicated. *See United States v. Hamilton,* 19 F.3d 350, 355–57 (7th Cir.1994).

We further conclude that the district court's use of limiting instructions—stating that Mr. Herriman's out-of-court statement was admissible only against Mr. Herriman—further curbed the effect of Roberts' testimony; we have no reason to believe that the jury did not follow those instructions. As the Supreme Court made clear in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Id.* at 206, 107 S.Ct. 1702. While an exception to that general rule was created in *Bruton* because, under those precise circumstances, there existed an overwhelming probability that the jury would be unable to obey the instruction that they disregard an incriminating inference, this consideration need play no part in our analysis. As we have noted, because the statement in issue was admissible against Gordon Robbins, there was no possibility of error under *Bruton.* *See Hamilton,* 19 F.3d at 355–57.

**(c)**

■ Finally, Gordon Robbins submits that Mr. Herriman's statement nullified his theory of defense, rendering the joint trial unfair. His defense theory, he explains, was that cooperating witnesses Osborne and Amezquita were not credible. However, after the jury witnessed the vid-

---

7.  *See United States v. Matthews,* 20 F.3d 538, 545–46 (2d Cir.1994) (concluding that, given the totality of the circumstances, the declarant's statement to his girlfriend that the codefendant participated in the bank robbery was inherently reliable and properly admitted at trial); *cf. United States v. Bradley,* 145 F.3d 889, 896–97 (7th Cir.1998) (concluding that, given the totality of the circumstances surrounding defendant's wife's declaration, statement did not lack sufficient indicia of reliability under Rule 804(b)(5) or the Confrontation Clause).

eotape of a drug deal between Osborne and Mr. Herriman, and after it heard Mr. Herriman's statement that he and Gordon Robbins were partners in the marijuana business, he claims that the jury could convict Gordon Robbins without considering the credibility of Osborne and Amezquita. He therefore contends that the district court abused its discretion in denying his motion to sever.

In *Richardson*, the Supreme Court considered and rejected the premise that separate trials should be conducted whenever an incriminating statement of one defendant is sought to be used against another defendant. *See* 481 U.S. at 209–10, 107 S.Ct. 1702. It noted that joint trials generally serve the interests of justice more efficiently and fairly and determined that it was too high a price either to conduct separate trials or to forgo use of codefendant confessions altogether. *See id.* at 210, 107 S.Ct. 1702. In this case, the district court's decision to continue the joint trial, requiring the jury to follow its instruction that the statement was admissible only against defendant Mr. Herriman and not against either of the other defendants, "represent[ed] a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." *Id.* at 211, 107 S.Ct. 1702; *see also United States v. Brooks,* 125 F.3d 484, 501 (7th Cir.1997) (noting that "a joint trial provides the best perspective on the evidence as a whole" and is more likely to lead to a correct result). In asserting, in conclusory fashion, that severance was necessary, Gordon Robbins has not demonstrated that the admission of that statement created a "serious risk that a joint trial would compromise a specific trial right" for Gordon Robbins. *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Although perhaps a separate trial would have of-

fered him a better possibility for acquittal, Gordon Robbins has not shown that he could not have a fair trial without severance. *See Brooks,* 125 F.3d at 501–02. Without that demonstration of actual prejudice, we conclude that the district court did not abuse its discretion in choosing to use the less drastic measure of giving limiting instructions to cure the risk of prejudice. *See id.; United States v. Hubbard,* 22 F.3d 1410, 1420 (7th Cir.1994) (a district court's ruling on a motion to sever is reviewed for abuse of discretion), *cert. denied,* 513 U.S. 1095, 115 S.Ct. 762, 130 L.Ed.2d 660 (1995).

**D. Admissibility of Proffer Letters and Plea Agreements**

■ Gene Robbins submits that the district court abused its discretion and therefore committed reversible error by admitting into evidence two proffer letters to the cooperating witness, Osborne, and the plea agreements of two other cooperating witnesses, Amezquita and Ramirez. He contends that the admission of these documents allowed the Government to bolster the credibility of those witnesses. One of the proffer letters and both plea agreements contained references to the respective cooperating witnesses' agreements to provide truthful testimony and his willingness to submit to a polygraph examination.

■ Our case law permits the prosecutor to elicit testimony on direct examination concerning the witness' plea agreement; indeed, he may place the entire plea agreement in evidence. *See United States v. Lewis,* 110 F.3d 417, 421 (7th Cir.), *cert. denied,* 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). We have long recognized that such testimony "is not likely to bolster [the witness'] credibility." *United States v. Mealy,* 851 F.2d 890, 899 (7th Cir.1988) (citation omitted).[8] Although we

---

8. *See also, e.g., United States v. Tulk,* 171 F.3d 596, 600 (8th Cir.1999) (concluding that evidence of the terms of a plea agreement was not improper bolstering); *United States v. So-*

*bamowo,* 892 F.2d 90, 95 n. 3 (D.C.Cir.1989) (concluding that witness' statement that he was cooperating as part of his plea agreement did not bolster his credibility), *cert. denied,*

have cautioned the Government to avoid unnecessary repetitive references to truthfulness in its plea agreements, *see Lewis*, 110 F.3d at 421; *Mealy*, 851 F.2d at 899, the district court must make the discretionary determination whether the prosecutor has emphasized disproportionately or repeated unnecessarily the promise to provide truthful testimony. We review a district court's decision regarding the admissibility of plea agreements and proffer letters for abuse of discretion. *See Lewis*, 110 F.3d at 422.

We have examined the proffer letters[9] and plea agreements[10] in this case. They appear to be standard in format and content to others we see; they do not overemphasize the defendant's promise to tell the truth. Defense counsel had ample opportunity for cross-examination so that the jury could evaluate the witnesses' credibility. In addition, the court gave two cautionary instructions to the jury. It first directed that the testimony of witnesses who had received benefits from the Government in connection with testifying should be "considered with caution and with great care." Tr. at 1297. It also instructed that the jury members were the sole judges of the credibility of the witnesses and that they should take into account "[the witnesses'] interest or lack of interest." Tr. at 1296. In our view, such

instructions removed any prejudicial tendency to enhance the credibility of these witnesses in the eyes of the jury. *See Lewis*, 110 F.3d at 421–22. The admission of those documents, we conclude, was not an abuse of the district court's discretion.

■■■■■ As for the prosecutor's comments about the plea agreements and proffer letters and truthfulness of the cooperating witnesses, most were unquestionably within the proper bounds of conduct. In fact, defense counsel did not object to any of the prosecutor's remarks at trial. *See United States v. DePriest*, 6 F.3d 1201 (7th Cir.1993) (holding that prosecutor's comments regarding plea agreements were proper because, throughout trial, government witnesses were questioned repeatedly about agreements). However, we are concerned about the prosecutor's statement about Osborne: "I'm not going to put somebody in this courtroom that would lie to you, or I suspect would lie to you, and ever give them any consideration." Tr. at 1343. Gene Robbins asserts that the prosecutor's remark was a personal endorsement of Osborne's veracity. Even the Government admits that the comment "may be problematic." We agree that this comment during closing arguments crossed the line of proper final statements. In determining whether it rises to the level of prosecutorial misconduct, we must eval-

---

498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990).

**9.** The May 2, 1997 proffer letter contains one paragraph in which, by agreement of the parties, it remained within the Government's discretion to offer Osborne a plea agreement, regardless of whether Osborne testified truthfully during an "off-the-record" proffer. The letter does not contain any reference to a polygraph examination. The June 27, 1997 proffer letter is similar to the plea agreement in *Lewis*. It provides (1) that Osborne agreed to testify truthfully concerning his own involvement, and that of others, in the drug conspiracy and controlled substances; (2) that if he did not testify truthfully, he would be subject to prosecution for false statements before a grand jury or perjury; (3) that the agreement could be withdrawn if Osborne did not testify truthfully, and (4) that he agreed to

submit to polygraph examination upon the Government's request.

**10.** Amezquita's and Ramirez's plea agreements contain four references to truthful testimony pertaining to the following topics: (1) the defendants agreed to provide truthful testimony concerning others as well as their own involvement in the drug conspiracy and controlled substances; (2) the defendants agreed that if they did not testify truthfully, they would be subject to prosecution for false statements before a grand jury or for perjury; (3) the defendants acknowledged that if they did not testify truthfully, the agreements could be withdrawn; and (4) the defendants agreed to submit to polygraph examination regarding any matter covered by the agreement. The agreements are similar to the one approved by us in *Lewis*, 110 F.3d at 421, n. 1.

uate the statement in light of the entire record to determine whether it deprived the defendant of a fair trial. *See United States v. Whitaker*, 127 F.3d 595, 606 (7th Cir.1997), *cert. denied*, 522 U.S. 1137, 118 S.Ct. 1098, 140 L.Ed.2d 153 (1998). In undertaking this evaluation, we note that no objection was raised to the statement at the time of the closing; we therefore review the remark for plain error. *See United States v. Cusimano*, 148 F.3d 824, 831 (7th Cir.1998).

The trial focused on the credibility of the cooperating witnesses. There is nothing improper about a prosecutor's comments concerning the credibility of a witness as long as the comments are tied to the evidence presented at trial or reasonable inferences from that evidence.[11] *See United States v. Patterson*, 23 F.3d 1239, 1250 (7th Cir.), *cert. denied*, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994). Our review of the record and, in particular, of the closing arguments of all counsel makes clear that the defense theory was that the cooperating witnesses had implicated the three defendants so that they could receive sentence reductions for cooperation. As such, the defense attacks on the credibility of those witnesses invited a response from the prosecutor. In our view, his remark was meant to "right the scale" and did not deprive the defendants of a fair trial. *See DePriest*, 6 F.3d at 1210–11 (concluding that defendant invited response when defense claimed trial reminded him of stories about McCarthyism and defense theory was that the government's witnesses "concocted a story in order to implicate the defendants"); *see also United States v. Alexander*, 163 F.3d 426, 429–30 (7th Cir.1998) (per curiam) (concluding that prosecutor's rebuttal comment that he did not "script" the case was invited when defense sought to impugn the law enforcement witness' credibility), *cert. denied*, — U.S. —, 119 S.Ct. 1082, 143 L.Ed.2d 83 (1999). The district court miti-

gated any effect of the remark made by counsel with this instruction: "Closing arguments of counsel are for the purpose of discussing the evidence that has actually been presented to you. Mere assertions alone by counsel in opening statements or final arguments do not constitute any evidence whatever in this case." *See United States v. Owens*, 145 F.3d 923, 927 (7th Cir.1998). Finally, we note that the weight of evidence against Gene Robbins was substantial and overwhelming. For that reason, we conclude that he was not deprived of a fair trial by the prosecutor's comment at closing.

### E. Limitations on Cross–Examination

#### 1.

■ One provision of the plea agreements and proffer letter signed by the cooperating witnesses stated that each of them was willing to submit to a polygraph examination at the discretion of the Government. The agreements were entered into evidence; the jury therefore could read that provision. Gene Robbins asserts that the jurors logically were invited to conclude that the polygraph tests actually were administered and therefore that the testimony of Osborne, Amezquita and Ramirez was truthful. Had defense counsel been given the opportunity to cross-examine the Government witnesses to ask whether they had taken the polygraph tests, Gene Robbins claims, the misperception could have been dispelled. However, the court directed that the issue not be raised by either side because "there's too much potential for confusion and speculation if it is brought up." Gene Robbins contends that the district court's refusal to allow that area of cross-examination violated the Confrontation Clause.

■ "[A] district court's Rule 403 balancing is afforded a special degree of deference: [o]nly in an extreme case are appellate judges competent to second-

---

11. In the case of Osborne, the Government had documentation of his trips to deliver mar-

ijuana; thus, his testimony was corroborated by that physical evidence.

guess the judgment of the person on the spot, the trial judge." *United States v. Dillard,* 43 F.3d 299, 305 (7th Cir.1994) (internal quotation marks, citation omitted); *see also United States v. Olson,* 978 F.2d 1472, 1480 (7th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993). Although we review a trial court's limitation on the scope of cross-examination for an abuse of discretion, we conduct a de novo review when the limitation directly implicates the Sixth Amendment right to confrontation. *See United States v. Sasson,* 62 F.3d 874, 882 (7th Cir.1995), *cert. denied,* 516 U.S. 1131, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996). Moreover, a violation of the Confrontation Clause is subject to harmless error analysis and will constitute harmless error if the violation did not contribute to the verdict "beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Nelson,* 39 F.3d 705, 708–10 (7th Cir. 1994).

■■■ "Although the Sixth Amendment confrontation clause does guarantee defendants the right to cross-examine witnesses ... the trial judge retains broad discretion in limiting the extent and scope of cross-examination." *United States v. Valles,* 41 F.3d 355, 359 (7th Cir.1994) (citation omitted). "[T]he Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross-examination." *Dillard,* 43 F.3d at 305 (citations omitted). "This is true even when the defendant is attempting to show interest, bias or motive: [A] trial violates the Sixth Amendment only where it has so abused its dis-

cretion as to prevent the jury from making a discriminating appraisal of the witness' testimony." *Valles,* 41 F.3d at 359.

■■■ The admissibility of polygraph evidence is a matter within the discretion of the district court. *See Dillard,* 43 F.3d at 305. In determining whether to admit polygraph evidence, the district court must take as its guide Rule 403 of the Federal Rules of Evidence: The court must balance such factors as "probative value, prejudicial effect, confusion of the issues, misleading the jury, and undue delay."[12] *Olson,* 978 F.2d at 1480; *see also United States v. Thomas,* 167 F.3d 299, 308–09 (6th Cir.1999) (polygraph evidence obtained by one party is almost never admissible under Federal Rule of Evidence 403, because of the danger of unfair prejudice). The trial court applied the balancing test of Federal Rule of Evidence 403 and determined that, in the context of this case, even the threshold question as to whether a polygraph test had been administered would confuse and cause speculation among the jury. We are confident that there was no abuse of discretion in that determination. *Cf. United States v. Scheffer,* 523 U.S. 303, 312–14, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (expressing concerns that admission of polygraph examination may infringe on "the [jury's] core function of making credibility determinations in criminal trials" and increase "the risk that juries will give excessive weight to the opinions of a polygrapher"). We note that the defendants had ample opportunity to discredit the testimony of the witnesses and to create doubt concerning their credibility. Accordingly, Gene Rob-

---

**12.** We note that the Supreme Court recently has held that the per se ban on the admission of polygraph evidence under the Military Rules of Evidence does not unconstitutionally curtail the Fifth or Sixth Amendment right of accused members of the military to present a defense. *See United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (concluding that rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'dispropor-

tionate' to the purposes they are designed to serve' "). The Fourth Circuit, like the military courts, has expressly banned the admission of polygraph evidence. *See United States v. Sanchez,* 118 F.3d 192, 197 (4th Cir.1997). Other federal circuits, for the most part, have abandoned the per se rule excluding polygraph test results and have left its admission or exclusion to the discretion of district courts. *See Scheffer,* 523 U.S. at 312, 118 S.Ct. 1261 (listing cases).

bins' Sixth Amendment claim that he was denied the right of cross-examination is without merit. Gene Robbins was not prevented from challenging the credibility of the cooperating witnesses or from proving that they had a motive to lie. The question whether they had taken a polygraph test "was merely peripheral," and therefore we conclude that no reversible error occurred. *See Olson,* 978 F.2d at 1480; *see also Sasson,* 62 F.3d at 882.

**2.**

In a related argument, Gene Robbins submits that the district court abused its discretion in limiting cross-examination of DEA Special Agent Schmidt about the extent of his investigation.[13] The district court sustained an objection to defense counsel's question whether Agent Schmidt had investigated the length of time that Mr. Herriman and Gordon Robbins had known each other. Outside the presence of the jury, the court explained:

> [I]t is not my intention to allow this trial to become a trial of the investigation. And it is my intention that the jury make its decision based on evidence actually presented rather than the—than speculation about the possible existence of other evidence that might have been developed if the investigation had been carried out in some other way.

Tr. at 546. Gene Robbins contends that the defendants' challenge to the quality and thoroughness of the investigation by law enforcement agents was an appropriate area of cross-examination. According to the Government, the defendants intended to impugn the thoroughness of that investigation in order to demonstrate that people other than the defendants were responsible for the crime and that law enforcement was either aware of, or ignored, evidence to that effect.

The district court retains wide latitude in limiting the extent and scope of cross-

examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431. When the district court's decision to limit cross-examination does not implicate a defendant's Confrontation Clause rights, the appropriate standard of review is the abuse of discretion standard. *See United States v. Saunders,* 166 F.3d 907, 920 (7th Cir.1999).

In this case, the record reveals that the court perceived the question at issue, in context, as one that might confuse the jury and cause it to speculate about what evidence is not before the jury. This is a valid reason for limiting cross-examination. In addition, we believe the information sought was of marginal relevance. *See id.* (holding that the extremely limited probative value of a report justified its exclusion under cross-examination); *United States v. Saunders,* 973 F.2d 1354, 1358–59 (7th Cir. 1992) (concluding that the defendant's question was not relevant to the government's case and only tangentially related to the defendant's defense theory), *cert. denied,* 506 U.S. 1070, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). We hold that the district court did not abuse its discretion in limiting defense counsel's cross-examination of Special Agent Schmidt.

## F. Denial of Motions to Continue

### 1. Motion to Continue Trial

The trial date of October 21, 1997, was the third date that the district court had set. Nevertheless, at the court's final pretrial conference on October 16, 1997, the three defendants moved for a continuance in order to assimilate the volumes of documentary evidence the Government had made available. The court denied their motions. Gene Robbins asserts that the denial of a continuance was an abuse of the court's discretion.

---

**13.** Gene Robbins does not claim that, in this limitation to the questions of defense counsel, his Sixth Amendment right of confrontation and cross-examination was denied.

In its October 20, 1997 Entry on Final Pretrial Conference, the district court put forth its reasons for the denial of the defendants' motions. The court noted that the defendants were well aware of the complexity and volume of the evidence. Despite notice of the trial's complexity, however, at the previous pretrial conference, held August 25, 1997, Mr. Herriman sought severance and an immediate trial date. The court denied his motion but emphasized that this case had priority on its calendar and that the October 21, 1997 trial date was a firm one. According to the court, at that August pretrial conference the Government stated that voluminous discovery materials had long been available but that no defense counsel had reviewed them. In response, the court stated, Mr. Herriman "scoffed at the usefulness of the disclosure." The court also noted that a continuance would be disruptive to the court's calendar and unfair to the Government, which had prepared for trial.

■ We review a district court's decision concerning trial management, such as its rulings on motions to continue the trial, for an abuse of discretion. *See United States v. Depoister,* 116 F.3d 292, 294 (7th Cir.1997). Our review of the record reflects that the district court did not, as Gene Robbins claims, have a "myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Instead, the court gave the defendants the opportunity to explain their reasons for requesting a delay at the pretrial hearing, and in its written Entry the court evaluated their requests by considering and balancing many of the appropriate factors: "the time required and already permitted for trial preparation; the diligence of the moving party; the conduct of the other party; the effect of delay; the reasons given by the movant for the continuance; the likelihood that a continuance will satisfy the movant's needs; the inconvenience to the court, the opposing party and the witnesses; and the extent of the harm which denial of the continuance will cause the opposing party." *Depoister,* 116 F.3d at 294 (citing *United States v. Windsor,* 981 F.2d 943, 947–48 (7th Cir.1992)); *see also United States v. Gantt,* 140 F.3d 249, 256 (D.C.Cir.) (presenting similar list of factors), *cert. denied,* —— U.S. ——, 119 S.Ct. 361, 142 L.Ed.2d 298 (1998). The district court was not obliged to continue the trial again to accommodate defense counsel's tardiness in reviewing discovery materials that had been available to them. In addition, we note that the defendants did not identify any specific material prejudice they suffered from their alleged inability to assimilate these records. Gene Robbins' complaint that he was unable to review all of the Government's discovery documents and that some were filed late is vague and conclusory. *See Gantt,* 140 F.3d at 257 (rejecting similar argument as unpersuasive).

In our view, Gene Robbins has not met his burden of establishing that the district court abused its discretion; he has not demonstrated that "the trial judge chose an option that was not within the range of permissible options from which we would expect the trial judge to choose under the given circumstances." *Depoister,* 116 F.3d at 294.

### 2. Motion to Continue Sentencing

#### (a)

■ Gene Robbins also challenges the district court's denial of his motion to continue the sentencing hearing. He was convicted by a jury on October 30, 1997. The date for his sentencing hearing was set for January 26, 1998. Gene Robbins filed numerous objections to the PSR and requested that his sentencing be continued for three to four weeks to review the trial transcripts. The court granted his request and continued the hearing to February 19, 1998.

Six days before the scheduled hearing, on February 13, Gene Robbins and Gordon Robbins filed a Joint Motion to Consolidate Sentencing Hearings. They claimed that several sentencing issues would be common to them both (including a challenge to Osborne's credibility—Gordon Robbins had retained an investigator to gather information on Osborne) and asked that the hearing for both defendants be set on March 6, 1998, the date that Gordon Robbins' sentencing hearing had been scheduled. On February 17, 1998, Gene Robbins' counsel filed a Motion to Re–Set Sentencing Date. Because of her heavy workload, she asserted, she had not been able to review the trial transcript she had received on February 6, 1998, in preparation for the sentencing.

The Government opposed the defendants' motion, arguing that no statutory or case law exists for joint sentencing and that the prosecutor's trial schedule would be adversely affected by a second continuance of Gene Robbins' sentencing. The court then denied the defendants' motion to consolidate sentencing hearings. It confirmed Gene Robbins' sentencing date of February 19, the hearing date set after the court had granted a three-week continuance.

We review a district court's decision to deny a continuance of a sentencing hearing only for an abuse of discretion. *See United States v. Gwiazdzinski*, 141 F.3d 784, 790 (7th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 186, 142 L.Ed.2d 152 (1998). On the record before us, we hold that the district court acted well within its discretion in denying the request for a second continuance. Defense counsel had almost four months in which to prepare for Gene Robbins' sentencing and had been granted one continuance. Counsel had represented him at trial and thus was intimately familiar with the case. Although she claimed that she had not had time to review the trial transcript adequately, she had reviewed it enough to identify and file fourteen objections to the

PSR. Gene Robbins has not articulated, to the district court or to us, a material or substantial prejudice resulting from the district court's denial of the second continuance. *See Depoister*, 116 F.3d at 295. The possibility that an investigator would find information to destroy the credibility of Osborne, a key government witness, is speculative and is an insufficient basis on which to demand a continuance. *See United States v. Earnest*, 129 F.3d 906, 913 (7th Cir.1997) (holding that due process did not require a court to delay sentencing for further investigation of a witness' credibility, which the court called a "useless and duplicative examination"); *see also Gantt*, 140 F.3d at 257 (concluding that the defendant's claim that the Government's fingerprint evidence could have been rebutted remains entirely speculative). The trial court's determination to not continue the sentencing hearing was reasonable, and was not an abuse of discretion.

**(b)**

At the beginning of the sentencing hearing, Gene Robbins' counsel again moved for a continuance. Defense counsel stated that she was not fully prepared, because of her work load, and that she needed time to prepare a more detailed challenge to the presentence report. The district court denied her request. It explained that all of the evidence relevant to the issues raised at sentencing had been heard at trial and that more time would not change the quality of the court's decision. We consider whether the court's decision to deny the continuance of a sentencing hearing was an abuse of its discretion, considering the circumstances surrounding the request and the reasons presented to the district court in support of the motion. *See Gwiazdzinski*, 141 F.3d at 790.

The district court considered and rejected defense counsel's request on the ground that the sentencing issues concerned matters that had been placed before the court

at trial four months earlier. *See United States v. Hall*, 35 F.3d 310, 315 (7th Cir. 1994) (upholding denial of a continuance of sentencing hearing because "a continuance merely would have been used to come up with a more detailed challenge to the credibility of various witnesses, each of which the court heard and observed"); *United States v. Knorr*, 942 F.2d 1217, 1222 (7th Cir.1991) (concluding that the "mere possibility that some additional evidence" would demonstrate the defendant's lesser role in the offense is insufficient to overcome our deference to the district court, and refusing to second-guess its decision to deny another motion to continue the sentencing hearing). Gene Robbins has failed to set forth any reason that would justify stopping the sentencing proceeding that had begun. Instead, he presented the same reason—lack of time to prepare—that he had offered twice before. The court had granted one continuance and had denied a subsequent request. We hold that the district court in no way abused its discretion in denying Gene Robbins' third request for a continuance.

## G. Deportment of the District Court

■ Gene Robbins takes up a contention raised by Mr. Herriman during trial. At a sidebar, after he had cross-examined Agent Schmidt, counsel for Mr. Herriman moved for a mistrial on the ground that the district judge "sat back in [his] chair and rolled [his] eyes and threw [his] pen down." The judge responded that he may have been shifting in his chair because he had a bad back. The judge also acknowledged that he may have been exasperated with some of counsel's cross-examination, which appeared to the judge to be irrelevant or calling for speculation by the witness, but that he was confident it did not require a mistrial.

■ When we consider whether a trial court's handling of the trial prejudiced the defendants in the eyes of the jury, we examine the defendants' allegations in the context of the entire record.

*See United States v. Mohammad*, 53 F.3d 1426, 1433–34 (7th Cir.1995). On this record there is no evidence of the court's bias or hostility and no evidence of prejudice to any defendant by the court's demeanor. Nor is there evidence that the jury noticed anything. It appears that the court may have expressed its displeasure with the examination questions of counsel in a single, isolated incident. The record reflects nothing that would suggest the slightest ground for a mistrial. "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, [ ] are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky v. United States*, 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Just as the Supreme Court concluded in *Liteky* that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," *id.* at 555, 114 S.Ct. 1147, we conclude that judicial physical movements and responses during trial ordinarily do not support a motion for mistrial. Neither Mr. Herriman, at trial, nor Gene Robbins, on appeal, contends that the court's demeanor reflected "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* We hold that Gene Robbins was not denied a fair trial by the district court's deportment.

## H. Bribery of Witness: 18 U.S.C. § 201(c)(2)

■ The Government offered Osborne, a cooperating defendant, immunity in exchange for his testimony against the defendants. Gordon Robbins and Gene Robbins submit that the Government violated 18 U.S.C. § 201(c)(2), which prohibits bribery of public officials and witnesses, when it offered immunity to Osborne. They contend that Osborne's testimony should be disregarded and their convictions set aside.

Our court has long held that "the government cannot violate 18 U.S.C. § 201(c)(2) by promising to do something it is authorized by law to do." *United States v. McGee,* 189 F.3d 626, 630–31 (7th Cir.1999) (citing *United States v. Barrett,* 505 F.2d 1091, 1102 (7th Cir.1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975)) (footnotes omitted); *see also United States v. Hardamon,* 188 F.3d 843, 847–48 (7th Cir.1999) (rejecting claim of prosecutorial misconduct based on government's violation of anti-bribery statute); *United States v. Mitchell,* 178 F.3d 904, 909 (7th Cir.1999) (rejecting claim that the government's agreements with cooperating witnesses violate the federal anti-bribery statute); *United States v. Condon,* 170 F.3d 687, 688–89 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 1784, 143 L.Ed.2d 812 (1999). We have joined all other circuits to have considered the claim in rejecting it. *See Hardamon,* 188 F.3d at 848 (listing cases). We hold that the Government's promise to provide immunity to Osborne did not violate § 201(c)(2).

## I. Sentencing Issues

### 1. Findings Under U.S.S.G. § 1B1.3(a)(1)(B)

■ The district court, at sentencing, concluded that each of the three defendants, as part of the conspiracy, was responsible for more than 3,000 kilograms of marijuana. Gordon Robbins and Mr. Herriman challenge the district court's determination of the drug quantity attributable to each of them. We review the court's drug quantity determination for clear error. *See United States v. Lanterman,* 76 F.3d 158, 160 (7th Cir.1996).

#### (a) Gordon Robbins' claim

■ Gordon Robbins challenges the district court's reliance on Osborne's testimony to support the amount of marijuana attributable to him. According to Gordon Robbins, because Osborne abused alcohol, the district court was obligated to subject Osborne's testimony to a heightened standard of scrutiny when evaluating the amount of marijuana attributable to Gordon Robbins. Relying on *United States v. Beler,* 20 F.3d 1428 (7th Cir.1994), Gordon Robbins contends that, once Osborne's testimony is subjected to that higher standard of scrutiny, the testimony of Amezquita, who attributed less marijuana to the conspiracy than Osborne, is more credible.

Under the relevant conduct guideline, a conspirator is liable for all the acts of his coconspirators which were "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). In *Beler,* our court held that the district court should have subjected the testimony of a witness to "heightened scrutiny" because the witness, who was a cocaine addict, had submitted three inconsistent statements regarding the amount of drugs attributable to the conspiracy. *See Beler,* 20 F.3d at 1433–35. As *Beler* expounds, the inconsistent statements of a witness, along with factors affecting the witness' credibility and reliability such as his drug addictions, are factors that must be considered and weighed carefully by the sentencing court. When the court must weigh the reliability of several witnesses who may be addicts, we defer to its determinations.

When, in such circumstances, the district court is faced with the differing live accounts of two witnesses and selects one that is as, or more, plausible than the other, its credibility judgment, which at the outset we are loathe to second-guess, will virtually never be disturbed.

*United States v. Clay,* 37 F.3d 338, 344 (7th Cir.1994). The difficulties in the witness' testimony in *Beler* were blatant internal inconsistencies compounded by his drug use; accordingly, we held that the witness' second affidavit was insufficient to support the district court's calculation of drug quantity. The "heightened standard of scrutiny" required in *Beler* was triggered by both the material inconsistency

in the witness' statements and his drug addiction. *See United States v. Lanterman*, 76 F.3d at 161 (distinguishing *Beler*, 'finding that glaring inconsistencies in the testimony of the witness that formed the basis of the judge's determination of the amount of drugs); *United States v. Garcia*, 66 F.3d 851, 858 (7th Cir.1995) (distinguishing *Beler*, concluding that an internally consistent statement of a marijuana user was sufficient to support the court's drug quantity calculation).

In this case, Osborne testified for more than a day; he was cross-examined by all three defense attorneys. Gordon Robbins challenges Osborne's reliability because he admitted that he abused alcohol; however, he does not argue that Osborne's testimony contained significant inconsistencies or lapses of memory regarding the amount of marijuana. In fact, the record reveals that even the alleged inconsistencies between Osborne's testimony and Amezquita's are not inconsistencies. Amezquita entered the conspiracy eight months after Osborne and clearly was at the lower level of the distribution operation. In · addition, Amezquita dealt primarily with Gordon Robbins, who gave him the marijuana he wanted Amezquita to break up. Osborne, however, began participating in the conspiracy around January of 1995 by delivering marijuana. Osborne testified that he generally took the marijuana he was delivering directly to storage facilities in Indianapolis and that, on at least a few occasions, he took large quantities of undivided marijuana he had just delivered to other locations, such as New York, Georgia and Michigan. Thus, it is entirely consistent with the record that Amezquita never saw much of the marijuana Osborne delivered.

The district court's findings on the amount of marijuana attributable to the conspiracy were clear and thorough. The court noted that Osborne's alcohol abuse was obvious and that his testimony should be, and was, evaluated with caution. It also explained how the court calculated the weight attributable to each defendant, referring to various evidence on deliveries and distribution. It also explained that it excluded several deliveries of marijuana about which there was testimony, reconciling any questions to the benefit of the defendant and describing the estimate of the amount of marijuana as conservative. Gordon Robbins has failed to demonstrate that the district court clearly erred in determining the quantity of marijuana attributable to him.

### (b) Mr. Herriman's claims

At sentencing, the district judge held Mr. Herriman responsible for all the marijuana attributable to the conspiracy, more than 3,000 kilograms. The court found that Mr. Herriman was extensively involved in the conspiracy in a significant role and over a long period of time. It called Mr. Herriman a "facilitator" rather than a supervisor. The court referred to specific evidence in the record that supported these findings. Mr. Herriman asserts that the court's finding was clear error because his involvement in the conspiracy was such that the total amount of marijuana distributed by the conspiracy was not reasonably foreseeable. We review the sentencing court's determination of the amount of drugs reasonably foreseeable to a member of the conspiracy for clear error only. *See United States v. Goines*, 988 F.2d 750, 775 (7th Cir.), *cert. denied*, 510 U.S. 887, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993).

The relevant conduct guideline states that a conspirator is liable for all the acts of his coconspirators which were "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). The application note further explains that, "[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-under-

taken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, n. 1; *see also United States v. Flores,* 5 F.3d 1070, 1083 (7th Cir.1993) ("Reasonable foreseeability refers to the scope of the agreement that [the defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about."), *cert. denied,* 510 U.S. 1074, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994).

Our case law supports the district court's finding that an individual who plays a role similar to Mr. Herriman's is responsible for the full amount of drugs attributable to the conspiracy even if he was neither in a leadership role nor physically involved in every drug transaction.[14]  Mr. Herriman argues that he should not be responsible for the full amount of drugs because his role in the offense did not involve him directly in many of the drug transactions.  He points out that he was not directly involved in many deliveries, did not plan particular shipments, and did not have actual knowledge of or participate in the full conspiracy.  However, the record amply supports that Mr. Herriman was a trusted lieutenant and part of the "inner circle" of the leaders.  He was involved in the conspiracy from the beginning.  He often made drug transportation arrangements over the phone with all of the other conspirators; he rented a storage shed for the storage of drugs; he

delivered drug proceeds; he was present at the delivery of several large shipments; and he knew at least generally that large amounts of drugs were being transported on a regular basis, even if he was not directly involved in every shipment.  We hold that the district court's finding that the full amount of marijuana attributable to the conspiracy was reasonably foreseeable to Mr. Herriman was not clearly erroneous.

**2.  Length of Mr. Herriman's Sentence**

 Mr. Herriman was sentenced to 180 months of imprisonment.[15]  At the time of sentencing, Mr. Herriman was 67 years old and claimed to be in poor health.  He argues that 180 months was almost certainly a life sentence for him as a practical matter.  Relying on *United States v. Martin,* 63 F.3d 1422 (7th Cir.1995), and *United States v. Prevatte,* 66 F.3d 840 (7th Cir.1995), he says he should not have been given what was in effect a life sentence when the guideline calculation for him did not call for a mandatory life sentence.  He claims that his sentence was imposed "in violation of law" or "as a result of incorrect application of the Guidelines," and therefore violates 18 U.S.C. § 3742.  We review de novo whether a district court violated that statute in its sentencing determination.  *See United States v. Williams,* 68 F.3d 168, 169 (7th Cir.1995).

14.  *See, e.g., United States v. Zarnes,* 33 F.3d 1454, 1475 (7th Cir.1994) (holding as fully responsible four defendants whose roles were described as "an enforcer and manager;" a "mid-level distributor" and "trusted lieutenant;" one in the "inner circle" with knowledge of the efforts of the conspiracy to obtain drugs; and a "main distributor"), *cert. denied,* 515 U.S. 1126, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995); *Flores,* 5 F.3d at 1083 (holding defendant responsible for the entire amount of drugs even though he was only directly connected to 34 kilograms because he was a "trusted worker" and his involvement could be traced to the beginning of the conspiracy); *United States v. Tolson,* 988 F.2d 1494, 1503 (7th Cir.1993) (holding defendant responsible for substantially more drugs than he was directly involved with because he harvested and transported loads of marijuana, was present

at another delivery, and knew of other conspirators involved in transporting the drugs); *United States v. Edwards,* 945 F.2d 1387, 1400–02 (7th Cir.1991) (reviewing sentences of multiple defendants, upholding sentences of those for whom the drug amounts were reasonably foreseeable).  We note that the Eighth Circuit, in *United States v. Alaniz,* 148 F.3d 929, 936–37 (8th Cir.1998), affirmed the drug quantity calculation of the district court as reasonably foreseeable to the defendant because he "had facilitated the acquisition" of the drugs.

15.  Mr. Herriman's sentence was calculated at a base offense level of 34, Criminal History Category of II, and guideline sentencing range of 168–210 months.

Mr. Herriman's present contention, that the district court violated § 3742, has first been raised here at the appellate level. In the district court, he asked to be sentenced at the low end of the guideline scale on the ground that, if he is given a 20-year sentence, "that's a pretty good guarantee" that the government "gets to bury him." R.87 at 24. He also argued for a downward departure based on his advanced age. However, the district court had taken into consideration Mr. Herriman's age and bad health when considering whether to depart downward and had decided that his circumstances did not warrant it.[16] It then sentenced Mr. Herriman in the middle of the range, to 180 months rather than 210 months "based, in essence, both on the seriousness of the offense and in balancing both your age and health conditions." *Id.* at 26.

Mr. Herriman's attempt, on appeal, to have this court review the district court's discretionary decision not to depart below the guideline sentencing range (which we are without jurisdiction to do under 18 U.S.C. § 3742, *see Prevatte*, 66 F.3d at 844), or to have this court review its discretionary decision to sentence at the middle rather than the low end of the range, cannot succeed, even when guised in this new argument. The district court clearly

considered all of Mr. Herriman's submissions concerning his age and poor health and reasonably took them into account when choosing the appropriate sentence. It heard Mr. Herriman's attorney argue that his client would die in prison if he were sentenced to a 20-year term; he did not argue, however, that such a term was in effect a life sentence and therefore was "in violation of law" because the guideline calculation for him did not call for a mandatory life sentence. In this case, the district court determined how long Mr. Herriman was to be confined and sentenced him to serve a definite term of years. No "life sentence" was considered.[17]

We conclude that the district court in no way abused its discretion, and certainly committed no plain error, in its sentencing of Mr. Herriman.

## Conclusion

For the reasons stated above in this opinion, the judgment of the district court is affirmed.

AFFIRMED

---

16. It is clear from the district court's statement that it knew it could depart downward and decided it was not appropriate:

> Both counsel have already addressed the departure issues, suggested by the defendant, based on age and physical condition. And this is a situation where I think it's pretty clear that the Sentencing Guidelines were intended to restrict sharply the practices that have been fairly common before they took effect, in which case arguments about a defendant who committed a serious crime at an advanced age and developed serious health problems might be heard more sympathetically.
>
> While it does seem to me the guidelines do not forbid the departures the defendant asked for in this case, I simply don't see anything so extraordinary in this case as to warrant a departure downward on either basis.

R.87 at 18.

17. The cases on which Mr. Herriman relies are inapposite. In both *Martin* and *Prevatte*, the defendants were convicted of arson with death resulting under 18 U.S.C. § 844(I). In *Martin*, the question of a life sentence was submitted to the jury, and the jury refused to impose a life sentence. *See* 63 F.3d at 1432. Because the district court gave the 45 year-old defendant a sentence of 50 years, our court held that, in light of the jury's rejection of a life sentence, the district court could not sentence the defendant to what is in effect a life sentence. In *Prevatte*, the sentencing court considered the sentencing range of 360 months to life and sentenced the defendants to life imprisonment. In both cases, we remanded so that the district court could adjust the sentence to ensure that the life expectancy of each of the defendants was appropriately considered. *Prevatte*, 66 F.3d at 846; *Martin*, 63 F.3d at 1435.